IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

    v.

JOHN SUGGS et al.,

           Defendants.

CRIMINAL ACTION
NO. 19-CR-00629

**Slomsky, J.**                                                                    **September 2, 2022**

**OPINION**

## I.    INTRODUCTION

This case involves two armed robberies of pharmacies in Philadelphia: 1) the Castor

Pharmacy, located at 6449 Castor Avenue, on October 19, 2017 ("the Castor Pharmacy Robbery")[1]

and 2) the Smith Pharmacy, located at 841 East Hunting Park Avenue, on February 22, 2018 ("the

Smith Pharmacy Robbery").[2]  (See Doc. No. 102 at 3.)   Before the Court are four Motions filed

by Defendant John Suggs ("Suggs") and Defendant Nikolas Passineau ("Passineau") (collectively

"Defendants").  The Motions are as follows:

---

[1]    While Suggs and Passineau are charged in connection with both robberies, this Opinion
focuses on the investigation of the Smith Pharmacy Robbery.  Therefore, the facts surrounding
the Castor Pharmacy Robbery need not be discussed in detail.

[2]    On March 5, 2020, a grand jury returned a four-count Superseding Indictment, charging Suggs,
Passineau, Russell Williams ("Williams"), Khalil Werts ("Werts"), and Tameer Miller
("Miller") with robbery which interferes with interstate commerce, in violation of Title 18
U.S.C. §§ 1951(a) and 2, and with using, carrying, and brandishing a firearm during and in
relation to a crime of violence, in violation of Title 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2 in
connection with the Smith Pharmacy Robbery and the Castor Pharmacy Robbery.  (Doc. No.
52.)  Count One of the Superseding Indictment charges Suggs, Passineau, Williams, and Werts
with committing the Castor Pharmacy Robbery.  (Doc. No. 218 at 159:13-18.) Count Two
charges these same individuals with using a firearm during and in relation to the robbery.  (Id.)
Count Three charges Suggs, Passineau, and Miller with committing the Smith Pharmacy
Robbery.  (Id.)  Count Four charges the same defendants with using a firearm during and in
relation to the Smith Pharmacy Robbery.  (Id.)  Williams, Werts, and Miller have entered guilty
pleas and are not parties to the Motions filed by Suggs and Passineau.

1) Suggs's Motion in Limine to Preclude Identification Testimony (Doc. No. 43).

2) Passineau's Motion to Suppress Identification and In Limine Bar to Court Identifications of the Defendant by Witnesses to the Robbery (Doc. No. 46) (Both Motions (Doc. Nos. 43, 46) will be referred to collectively as "Motions Related to Photo Array Identifications").

3) Suggs's Motion to Suppress Cell Phone Data (Doc. No. 44).

4) Passineau's Motions to Suppress Cell Phone Data (Doc. No. 47) (Both Motions (Doc. Nos. 44, 47) will be referred to collectively as "Motions to Suppress Cellphone Data").

The Motions Related to Photo Array Identifications assert that photo arrays shown to witnesses present during the Smith Pharmacy Robbery violated Defendants' due process rights because the arrays were unnecessarily suggestive and there was substantial risk of misidentification. (See Doc. No. 43 at 5 ¶ 14.) (See also Doc. No. 46 at 7-8.)  Further, Passineau argues that several of the eyewitness identifications of him are not identifications at all and therefore are not relevant under Federal Rules of Evidence 401 and 402,[3] while Suggs contends that evidence of his identification by an eyewitness should be excluded under Rule 403.[4]  (See Doc. No. 46 at 8-9.) (See also Doc. No. 247 at 1.)

---

[3]  Federal Rules of Evidence 402 essentially provides that relevant evidence is admissible unless the United States Constitution, a federal statute, the Federal Rule of Evidence, or "other rules prescribed by the Supreme Court" say otherwise.  Also, irrelevant evidence is not admissible. See FED. R. EVID. 402.  Rule 401 provides the definition of relevancy.  "Relevant evidence" means evidence having "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." See FED. R. EVID. 401.

[4]  Federal Rule of Evidence 403 provides:

Additionally, the Motions to Suppress Cellphone Data challenge under <u>Franks v. Delaware</u>, 438 U.S. 154 (1978) the legality of the search warrant affidavits supporting the search and seizure of Defendants' cellphone records.  In <u>Franks</u>, the United States Supreme Court held that if an affidavit submitted in support of a search warrant contains false statements, made knowingly or intentionally or with reckless disregard for the truth, these statements may be excised from the affidavit and if what remains does not establish probable cause, the evidence must be suppressed. 438 U.S. at 155-56.  Defendants contend here that the police knowingly and intentionally made false representations regarding the circumstances involving the photo arrays which are referred to in the search warrant affidavit.  (Doc. Nos. 244, 246.)  Further, they submit that the search warrant affidavit was false where it stated that Detective Mark McCullion "recognized" both Defendants in the Smith Pharmacy security footage when in reality Detective McCullion only said they "appeared" to be Defendants.  (Doc. No. 244 at 10.) (Doc. No. 246 at 2.)  Thus, Defendants ask the Court to exclude from trial both the evidence of the identifications made during the photo arrays and the evidence obtained during the search and seizure of their cellphone records.

The Government filed a response in opposition (Doc. No. 48) and a hearing on the Motions was held on February 17, 2022.  (Doc. No. 200.)  The following individuals testified at the February 17th hearing: 1) Detective Robert Miles, 2) Detective James Miles, 3) Detective Alfred Bender, and 4) Detective Mark McCullion.  (<u>Id.</u>)  A continuation of the hearing was held on July 25, 2022.  (<u>See</u> Doc. No. 229.)  At the July 25, 2022 hearing, Detective Francis Green, the affiant

---

The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

FED.R.EVID. 403

on the search warrants' affidavit, testified.  (Doc. No. 233 at 8:6-7.)  Subsequently, the parties filed

Proposed Findings of Fact and Conclusions of Law.  (Doc. Nos. 243-47.)  For reasons that follow,

the Motions will be denied.

## II.     RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A.  The Search Warrant for Suggs and Passineau's Cellphone Records.

The search warrants for both Defendants Suggs and Passineau's Cellphone Records are

essentially identical, the only difference being the phone numbers associated with each Defendant.

(See Doc. No. 48 at 17 n.8.)  The search warrant describes the items to be searched for and seized

as follows:

> Information and content pertaining to cell phone# (267) 241-6202,[5] including:
> Subscriber information, Cell Site location information, incoming and outgoing calls
> from 2/19/18 @ 12AM through 2/27/18 @ 11:59PM, text messages, content and
> activity.

As stated, Detective Green was the affiant on the two search warrant affidavits.  (Doc. No.

233 at 8:6-7.)  The search warrant affidavit is copied below in several places.  It details both the

facts surrounding the Smith Pharmacy Robbery and subsequent Philadelphia Police Department

(PPD) investigation.  Defendants seek to excise from the affidavit under Franks v. Delaware the

portions in bold.

> On 2-22-18 at 11:50 am a black male and an [sic] Hispanic male wearing
> fluorescent yellow/green vest entered the Smith Pharmacy located at 841 E Hunting
> Park.  Both males were wearing masks and the black male was armed with a black
> handgun.  They ordered everyone onto the ground.  The black male then pointed
> his gun at numerous employees and asked them where the narcotics were.  The
> Hispanic male took approximately $100 USC from the front register.  An employee
> showed the black male where the narcotics were at and he ordered the Hispanic

---

[5]  This phone number is allegedly associated with Suggs.  The Government also executed a
search warrant for cellphone number (267) 401-4964, which allegedly is associated with
Passineau.

male to fill a duffle bag with red markings[6] that they had brought with them.  After filing the bag the black male specifically asked where the Promethezyne was at.  The black male ordered the Hispanic male to grab the one bottle that they had.  Complainant M.L. yelled at the black male and he pointed the gun at her forehead.  The males then fled northbound on H St towards Bristol.  Video of this incident was received from the store, 4223 N H [S]t and the Ebby building at Bristol and H St.  The scene was processed and two DNA swabs were obtained from the counter where the Hispanic male placed his bare hand while jumping over the counter.  Taken from this robbery was 1 bottle of Promethezyne, multiple bottles of Oxycodone, Oxycotin, Methadone, Fentanyl patches and morphine pills of various dosages.  The estimated value of narcotics taken was $60,000 USC.

On 2-22-18 at 12:04pm, PO Kyle Morris and PO Jose Borrero observe a dark gray 2007 Dodge Charger driving a high rate of speed while travelling southbound on G St toward Hunting Park.  The vehicle avoids a steady red light by cutting through the Lukoil Gas Station on the northwest corner of G and Hunting Park, away from the area of the robbery, which is one block away and 5 minutes later.  The officers stop this vehicle, which is being driven by Tameer Atif Miller, dob 2-2-99, 5855 Penn St.  The vehicle has no passengers.  The vehicle has a PA tag of KDR-6367.  This tag did not belong to the vehicle, even though it had a good registration under the tag of KTL-0066.  The KDR-6367 tag belonged to a 2007 BMW registered to a Olinda Posad Naranjo, 5314 Akron St.  The vehicle's rear tire rims are silver and the vehicle's front tires are black rimmed.  After the car stop was complete, Miller was let go.  This vehicle stop was recorded by the officer's safety cam.

On 2-23-18 detectives received the surveillance video from the EBBY building from Tech support operator E.M.  The video shows the suspects arrive in a dark gray Dodge Charger with a silver rim on the rear passenger side and a black rim on the front passenger side tire.  A third male appears to be driving.  They arrive driving westbound on Bristol, perform a u-turn, then park on the south side of Bristol, east of H St.  The males can be seen exiting the vehicle and standing on the 4200 block looking in the direction of the pharmacy.  They return to the Charger and then exit again and walk toward the Pharmacy.  They walk up and down on the 4200 block of H St from 11:38 am to 11:44 am.  At 11:50 am they walk back down toward the pharmacy, where they rob it.  At 11:58 am, you can see the males running back to the Gray Dodge Charger.  One of the males is carrying a large duffle bag, as seen on the store video. The break [sic] lights are activated while the black male is entering the vehicle, showing that there is a third person driving the vehicle.  This vehicle appears to be the same vehicle used in the robbery.

While reviewing the surveillance video from the store, the construction vests worn by the males appear to have been turned inside out.  Detective Bender noticed some

---

[6]   The reason for inserting in the affidavit the reference to the "red markings" has not been explained by the parties.

writing on the rear shoulder area of the Hispanic male that appeared to be backwards. Detective Liebsch took multiple stills that show the writing and took a photo of the writing. Taking it to a mirror, the writing says "Steven Kempf" with smaller letters underneath, all in a black rectangle. Detective Liebsch used an internet search and found that the emblem for the company matched to Steven Kempf Building Supplies, located at 381 Brooks Rd in King of Prussia.

Detective Green and Detective Liebsch drove to King of Prussia and met with members of the Steven Kempf organization. Employee B.K. was shown the video of the robbery and stated that both vests were the issued by their company and only their employees would have access to them. He also stated that the vest with the writing was new to the company within the last 6 months. B.K. was able to have his employees provide the detectives with a list of 70 employees.

The video of this robbery was placed onto the Philly Police YouTube Channel for public viewing.

On 2-27-18, Detective Liebsch and Detective Green went to the 5800 block of Penn St and the 5300 block of Akron in an attempt to locate the Dodge Charger driven by Tameer Miller.[7] **While looking for the vehicle Detective Liebsch received a phone call from Detective Mark McCullion. He stated that he had seen the YouTube video of the robbery and recognized the Hispanic male as Nickolas Passineau and the black male to be John Suggs, 5418 Akron St. He recognizes them because they are targets of a pharmacy robbery investigation on 10-19-17 at the Castor Pharmacy located at 6449 Castor Ave (DC#17-02-059200). Detective McCullion stated that these males have been known to him since November of 2017.** John Suggs, 5418 Akron St, Philadelphia PA 19124 is listed as an employee on the list of people who work for Steven Kempf Building Materials.

(See Doc. No. 48-1 at 62-68.)

As previously noted, Defendants claim that this phone call between Detective Liebsch and Detective McCullion was intentionally misrepresented in the search warrant affidavit because it states that Detective McCullion "recognized" Defendants in the Smith Pharmacy security footage. In actuality, he only said they "appeared" to be Defendants. (Doc. No. 244 at 10.) (Doc. No. 246 at 2.) At the February 17, 2022 hearing, Detective McCullion testified that he identified

---

[7] Detective Green testified at the July 25, 2022 hearing that he believed Tameer Miller was the getaway driver for the Smith Pharmacy Robbery. (Doc. No. 233 at 15:1-4.)

Defendants based on their body types and skin complexions. (Doc. No. 218 at 125:23-25.) Specifically, he believed the Black male in the video was Suggs and the Hispanic male was Nickolas Passineau. (Doc. No. 245 at 3.) During his testimony, Detective McCullion admitted that he believed one of the robbers to be Hispanic based on his light brown skin tone, but also acknowledged that other races may have the same skin tone. (Doc. No. 245 at 3.) Moreover, he believed the suspects in the video were Defendants because both the Smith Pharmacy Robbery and the Castor Pharmacy Robbery were similar "takeover robberies," where the robbers "rush" the counter. (Doc. No. 218 at 125:20-21.) Finally, Detective McCullion thought that Suggs was wearing the same grey sweatshirt in both robberies. (Id. at 126:1-5.)

### B. Photo Spread Identifications After the Smith Pharmacy Robbery.

The search warrant affidavit then continues on by providing information on the photo array identifications of Defendants by eyewitnesses to the Smith Pharmacy Robbery. This information, along with additional details testified to at the evidentiary hearings on the Motions, are provided below.

Four witnesses were able to identify either Suggs or Passineau as the robbers from photo arrays: 1) Christina Soto ("Soto"), 2) Diana Cologne ("Cologne"), 3) Martiza Rivera ("Rivera"), and 4) Melonise Lynch ("Lynch"),[8] all of whom were working at Smith Pharmacy at the time of the robbery. (See Doc. No. 48 at 4-5.) Christina Soto, Diana Cologne, and Maritza Rivera all selected Passineau from the photo array as one of the robbers. (See id.) Melonise Lynch was shown two photo arrays, one containing Suggs and the other Passineau. She was able only to identify Suggs. (See Doc. No. 48 at 6.)

---

[8]   Another employee, Y.T., was shown a photo array, but could not make an identification.

Each witness was presented with a "blind-photo array," which occurs when an officer or detective not directly involved in the investigation presents six photos to the witnesses, one at a time. (Doc. No. 218 at 25:24-25-26:1-5.)  (See also Doc. No. 243 at 3.)  The officer showing the photo array did not select the photos.  (Id.)  Instructions were read out loud to each witness prior to being shown the photo arrays.  (Id. at 27.)  The instructions are set forth in their entirety below:

> In a moment, I am going to show you a series of photos.  The person who committed the crime may or may not be included in the array.  Also, you should be aware individuals depicted in the array photos may not appear exactly as they did on the date of the incident because features such as head and facial hair are subject to change.  The PPD [Philadelphia Police Department] will continue to investigate the crime whether or not an identification is made and you may be presented with additional photo arrays at a later date.
>
> As the person showing you these photographs, I do not know the suspect's identity. I am required to show you all of the photos in the series even if you identify someone.
>
> The photos will be shown to you one at a time and are not in any particular order. Take as much time as you need to look at each one.  If you recognize anyone, I will write down your reactions.  If you identify anyone as the offender, I will then ask you "How confident are you?" and again, write down your response.
>
> At the end of the array, I will ask you to review what I have written down.  If what is written is correct, I will ask you to sign the bottom of each page.  If anything is incorrect, please let me know.
>
> Because this is an ongoing investigation, you should not discuss this identification procedure or its results.  Do you understand the way the Photo Array procedure will be conducted and the instructions I have given you?

(See Doc. No. 43-1.)

Each witness signed the bottom of these instructions, acknowledging that they understood them.  Six photos were then shown, with the officer asking after each photo, "Do you recognize this person?" (See Doc. No. 48-1 at 3.)  The officer then circled whether the witness answered yes or no.  (Id.)  Regardless of the answer, the officer wrote down the witness's exact response.  (Id.)

Next, as stated in the instructions, the witnesses were asked if they were confident that the person in the photo committed the robbery and the officer documented their answer to that question.  (Id.)

Below in bold is what was written in the search warrant affidavit regarding the photo array identifications, all of which Defendants claim should be excised under Franks v. Delaware. Additional information relevant to the Motions is also described.

    1.   The Photo Arrays Shown to Witnesses D.C. and C.S.

**On 2-28-18 Nikolas Passineau, pp#1059587 was placed in a photo array along with 5 other males of similar description by Detective Green.[9]**

**On 2-28-18 Detective Bender showed a photo spread containing Nikolas Passineau, pp#1059587 to complainant D.C.[10]  Complainant D.C. identified Nikolas Passineau in the sixth position, stating, "He looks most like the guy." When asked if confident that this was the person who did the robbery, she replied, "He is the closest."[11]**

**On 2-28-18 Detective Robert Miles#627 showed a photo spread containing Nickolas Passineau, pp#1059587 to complainant C.S.[12]  Complainant C.S. instantly identified Nickolas Passineau, pp#1059587 in the fifth position, stating, "The eyes and eyebrows are the same.  He turned and looked at me and he talked to me."  When asked if she was confident that this was the person who committed the robbery, she replied, "I am confident that is him."**

Later, on July 18, 2018, a preliminary hearing was held in the Philadelphia Court of Common Pleas regarding Defendant Passineau's arrest for the Smith Pharmacy Robbery.  (Doc.

---

[9]   Detective Green assembled the photo arrays, but did not participate in their showing.  (Doc. No. 247 at 6.)

[10]   Diana Cologne was shown the photo array at her house.  (Doc. No. 218 at 61.)

[11]   Detective Green retrieved the photo arrays and the witnesses' responses from the detectives who administered them.  (Doc. No. 233 at 35.)

[12]   This witness has been identified as Christina Soto.  (Doc. No. 244 at 8.)  At the hearing, Detective Miles testified that since the PPD began conducting blind photo arrays, he has not blocked out portions of faces in the arrays.  (Doc. No. 218 at 48-49.)

No. 245 at 6.)  (See also Passineau Ex. 1.)  Christina Soto was the first witness called.  (Id.)  During

her testimony, she stated that she did not see anyone in the courtroom she recognized from the day

of the robbery, even though Passineau was present.  (Id.)  Further, she testified that she never used

the word "confident" to describe her certainty of the photo she selected.  (Id.)

      2.   The Photo Arrays shown to Witness M.R.

**On 3-1-18 Detective James Miles#8060 showed a photo spread containing Nickolas Passineau, to complainant M.R.[13]  Complainant M.R. stated that she did not see him but looked at the video.[14]  She was not sure if it was Passineau in the #4 position or another male in the #5 position but stated that it looked more like #4.**

While testifying at the February 17, 2022 hearing, Detective Miles said that when he got

to Photo Four, Maritza Rivera said, "I'm not sure. I'm looking at the eyebrows and eyes."  (Doc.

No. 218 at 45.)  When he asked if she was confident that the person in the photo was the robber,

she responded, "I'm going by the video I saw on TV.  In the store, the male told me to look down

and then he told me to get on the floor."  (Id.)  Due to this response, Detective Miles did not circle

that she recognized the person in Photo Four.  He then showed her Photo Five, where she said,

"I'm looking at his eyes – no I think more number 4 (referring to Photo Four)."

      3.   The Photo Arrays shown to M.L.

**On 3-1-18 Detective Winward#8092 showed a photo spread containing Nickolas Passineau to complainant M.L.,[15] who could not identify anyone.**

**On 3-1-18 John Suggs, pp# was placed into a photo array along with 5 other males of similar description by Detective Green.**

---

[13]   This witness has been identified as Maritza Rivera.  (Doc. No. 244 at 9.)

[14]   During his testimony at the February 17, 2022 hearing, Detective James Miles stated that while he did not participate in the preparation of the photo array, he generally knew that the underlying crime was a pharmacy robbery.  (Doc. No. 218 at 42-43.)

[15]   This employee has been identified as Melonise Lynch.  (Doc. No. 247 at 1.)

**On 3-1-18 Detective Bender showed a photo spread containing John Suggs to complainant M.L.  Complainant M.L. identified John Suggs.  She stated, "That one, his lips look a little more fuller then what I recall."  When asked by Detective Bender if she was confident that this is the person who committed the robbery, she stated.  Out of the six photos.  If I had to put money on it, it would be him."**

       4.   The Photo Array shown to Y.T.

**On 3-1-18 Detective Gonzalez showed photo spread containing John Suggs to complainant Y.T., who could not identify anyone in the photo spread.**

The search warrant affidavit then continues as follows:

On 2-28-18 Detective McCullion provided Detective Liebsch with the phone numbers of John Suggs and Nickolas Passineau.  John Sugg's phone number is 267-241-6202(T-Mobile).  Nickolas Passineau's phone number is 267-401-4964(T-Mobile).

Based on this information the affiant is respectfully requesting a Search and Seizure warrant be issued for purposes of retrieving the cell phone data associated with 267-401-4964, including but not limited to: subscriber information, customer name, address, date of birth and any information related to the subscriber, any other cell phone number associated with the account and subscriber activation date, All call detail/direct connect detail/SMS-text message detail/EVDO-PCMD detail and billing records including but not limited to: date and time of call, duration of call, number called, calling number, CELL SITE information including SECTOR, Cell ID, Site ID, description, address, city, state, zip code, country, Latitude and Longitude, historical precision location information, per call measurement data, and any/all notes or notations on the account from 2-19-18 at 12:00 am to 2-27-18 at 11:59 pm to assist law enforcement in obtaining additional evidence as it relates to the on-going robbery investigation.

### C.  Search of Defendants' Cellphone Records.

On March 16, 2018, pursuant to the judicially approved search warrant supported by the above-quoted affidavit, investigators obtained the cellphone records for Passineau's phone number, including historical Cell Site Location Information ("CSLI").[16]   (Doc. No. 48 at 6.)

---

[16]   The Government explains in its Opposition to the Motions: "CSLI identifies the 'cell towers' (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connects.  Accordingly, cell site data provides an approximate location of the cellular telephone."  (Doc. No. 48 at 6 n.5.)

According to the Government, subscriber information for that account showed it was registered to a Nico Savage at 3213 Hartville Street, Philadelphia.  (Id.)  A search of the publicly available databases show that the phone number is also associated with Passineau at 3030 Hartville Street. (Id.)  On April 5, 2018, the same information was collected from Suggs' phone number, with subscriber information for that account showing it was registered to him at 5413 Akron Street, Philadelphia.  (Id. at 5-6.)  Analysis of the records revealed that the cellphones used cell towers in the vicinity of Smith Pharmacy prior to the robbery.  (Id. at 6.)[17]

With these facts in mind, the Court will turn to the Motions.

## III.   ANALYSIS

### A.   Motions Related to Photo Array Identifications

In their respective Motions, Defendants Suggs and Passineau seek to exclude evidence of the photo array identifications by the witnesses of the Smith Pharmacy Robbery.  (Doc. Nos. 43, 46, 245, 247.)  Both Defendants contend that the identification procedure violated their due process rights because they were unnecessarily suggestive and there was a substantial risk of misidentification. (See Doc. No. 43 at 5 ¶ 14.) (See also Doc. No. 46 at 7-8.)

Specifically, Suggs seeks to preclude the photo array identification by Melonise Lynch, the only witness to identify him, because "certain factors put the accuracy of the identifications in question and its introduction would be unfairly prejudicial," in violation of Federal Rule of Evidence 403.  (Doc. No. 43 at 5 ¶ 14.)  (Doc. No. 247 at 1.)  These factors include: 1) the limited time to observe the robber, 2) the limited facial features visible due to the robbers wearing ski masks, 3) the degree of attention while the robbery was taking place, 4) the lack of certainty

---

[17]   On April 19, 2018, Suggs was arrested by the PPD in connection with the robbery of Smith Pharmacy.  (Doc. No. 189 at 2.)

demonstrated by Melonise Lynch at the identification, and 5) the amount of time between the robbery and the presentation of the photo array.  (Doc. No. 218 at 21:3-10.)

Passineau contends that the photo arrays were constitutionally defective because the robbers wore ski masks and the persons in the photos did not have masks on.  (Doc. No. 46 at 7.) (Doc. No. 245 at 4 ¶ 12.)  Moreover, he argues that because the detectives believed that one of the robbers was Hispanic based on his light brown skin tone, the failure to include in the photo arrays persons from other races who may have similar skin tones made the photo arrays unnecessarily suggestive.  (Doc. No. 245 at 10.)  Finally, he argues that the identifications by Christina Soto, Maritza Rivera, and Diana Cologne are not identifications at all and therefore are irrelevant.  (Doc. No. 46 at 8-9.)[18]  Moreover, he relies on Christina Soto's preliminary hearing testimony as evidence of an improper identification.  (Doc. No. 245 at 12.)

In opposition, the Government asserts that the procedure used by the detectives was not unnecessarily suggestive.  (Doc. No. 48 at 12.)  Specifically, there is "no claim that investigators acted improperly to induce the witnesses who identified [Defendants] to pick their pictures out of the arrays."  (Id.)  The photo arrays presented to the witnesses "contained six individuals who were similar-looking men with similar features and expressions."  (Id. at 13.)   Additionally, the police made no suggestive comments or cues when showing the photos.  (Id.)  In terms of a substantial risk of misidentification, the Government contends that the Biggers factors, explained below, weigh in favor of admissibility.  (Id. at 15.)  The pharmacy was well-lit and each witness was just

---

[18]  In his Motion, Defendant Passineau also seeks suppression of any in-court identification of him by the witnesses to the Smith Pharmacy Robbery.  (Doc. No. 46 at 7.)  He argues that the in-court identifications are irrelevant.  (Id.)  In response, the Government argues that in-court identifications are "highly relevant."  (Doc. No. 48 at 16-17 n. 7.)  The Court will rule on this aspect of the Motion at trial if the identification of Passineau by any government witness is offered.

a few feet away from the robbers.  (Id.)   Further, each witness observed the areas of Defendants'
face that were not covered by their ski masks.  (Id.)

### 1.  Standard of Review for Photographic Array Evidence

Under the due process clause of the United States Constitution, identification of a
defendant made during a photographic array may be suppressed, but "[o]nly when evidence 'is so
extremely unfair that its admission violates fundamental conceptions of justice."  Perry v. New
Hampshire, 565 U.S. 228, 237 (2012).  In this regard, the Third Circuit Court of Appeals in United
States v. Brownlee noted that an identification procedure violates a defendant's due process rights
only if it is both: 1) unnecessarily suggestive[19] and 2) creates a substantial risk of misidentification.
454 F.3d 131,137-38 (3d Cir. 2006) (citing Manson v. Brathewaite, 432 U.S. 98, 107
(1977))(emphasis added).   Regarding the "unnecessarily suggestive" prong, the Third Circuit
explained as follows:

> [S]howing a witness a photographic array can constitute a denial of due process
> when police attempt to emphasize the photograph of a given suspect, or when the
> circumstances surrounding the array unduly suggest who an identifying witness
> should select.   In evaluating the suggestiveness of a photographic array, we
> examine the totality of the circumstances to determine whether the array's
> suggestiveness denied the defendant due process.   However, the defendant has the
> burden of proving that the identification procedure was impermissibly suggestive.

United States v. Lawrence, 349 F.3d 109, 115 (3d Cir. 2003) (internal citations omitted).

With regard to "substantial risk of misidentification," the second prong of the due process
test, "reliability is the linchpin" of that analysis.  Perry, 565 U.S. at 239 (quoting Manson, 432 U.S.

---

[19]   As the Third Circuit explained in Brownlee, unnecessary suggestiveness "contains two
component parts: that concerning suggestiveness of the identification, and that concerning
whether there was some good reason for the failure to resort to less suggestive procedures."
454 F.3d at 137 (quoting United States v. Stevens, 935 F.2d 1380, 1389 (3d Cir. 1991).   Here,
the PPD did not use a procedure requiring an analysis of whether a less suggestive one should
have been used.

at 114).   As the United States Supreme Court explained in <u>Neil v. Biggers</u>, "in order to determine whether an identification was reliable even though the confrontation procedure was suggestive, we must look to the totality of the circumstances."   <u>Brownlee</u>, 454 F.3d at 138 (citing <u>Neil v. Biggers</u>, 409 U.S. 188,199-200 (1972)).   Courts consider the following when evaluating likelihood of misidentification:

> [T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

<u>Biggers</u>, 409 U.S. at 199-200 ("the <u>Biggers</u> factors").

## 2.   The procedure used by the PPD during the photo arrays was not unnecessarily suggestive.

Here, the procedure used by the PPD was not unnecessarily suggestive.[20]   The photo arrays contained photos of individuals with similar facial features, hairstyles, and skin tones as Defendants.   The fact that the photo arrays did not include individuals of other races did not render them unnecessarily suggestive.   The proper inquiry is whether the individuals in the photo arrays looked similar to Defendants, which was the case here.   And this was confirmed by the Court's examination of the photo arrays.

Additionally, each detective read instructions aloud to the witnesses that included that the detective did not know the identity of the suspect and that the person who committed the crime may or may not be in the photo array.   (Doc. No. 218 at 27.)   The instructions went on to state that features like head and facial hair are subject to change and they could take as much time as they needed looking at the photos.   (<u>Id.</u>)   Other neutral instructions were included and are quoted <u>supra</u>.

---

[20]   The fact that one witness, Y.T., could not identify anyone in the photo array is further evidence that the procedure used by the PPD was not unnecessarily suggestive.

All the witnesses signed that they understood these instructions.  (Id.)  The detectives then recorded their responses under the photos they selected.  The detectives did not emphasize a particular photograph or make any suggestive comments or cues.  Finally, in regard to Christina Soto's preliminary hearing testimony, as the Government correctly points out, "[w]hether …[she] was able to identify [Passineau] in the courtroom does nothing to disturb her identification of Passineau in the photo array immediately following the robbery."  (Doc. No. 243 at 7.)  Therefore, Defendants have not met their burden of proving that the procedure used to identify either Suggs or Passineau in the photo arrays was unnecessarily suggestive and for this reason the evidence of the photo arrays will not be suppressed.

### 3. There is no substantial risk of misidentification regarding the identifications made by Diana Cologne, Melonise Lynch, Christina Soto, and Maritza Rivera.

As noted, Third Circuit has held that for photo array evidence to be suppressed, a defendant must prove both prongs of the due process analysis: 1) unnecessarily suggestive and 2) substantial risk of misidentification.  See Brownlee, 454 F.3d at 138 (quoting Brathwaite, 432 U.S. at 106) (emphasis added).  Because the photo arrays and the procedure surrounding the showing of the photos was not unnecessarily suggestive, the Court need not reach the second prong of the Brownlee test.  But for sake of completeness, the second prong, whether there is substantial risk of misidentification under the Biggers factors, will be addressed.

Considering the Biggers factors, the evidence presented at the pretrial hearings does not show a substantial risk of misidentification arising from the photo arrays by Diana Cologne, Melonise Lynch, and Christina Soto.  Although there is a concern in this case that there is some risk of misidentification because the robbers were masked, the Court cannot find that the risk is substantial.  As a reminder, Diana Cologne and Christina Soto identified Passineau, while

Melonise Lynch identified Suggs.  While it is evident that the robbers did wear masks and the witnesses' degree of attention was limited under the circumstances of the robbery, they did provide a description of the robbers that led to their identifications and had sufficient time to observe them. Furthermore, although the witnesses' level of confidence varied, each pointed to a factor that led them to identify either Passineau or Suggs.  Finally, they were each shown the photos within a week of the robbery.

Regarding Maritza Rivera, who identified Passineau, also within a week of the robbery, there is also some risk of misidentification, but not a substantial one that would require the suppression of her identification.  During the robbery, the robber told her to look at the ground, so she did not have the opportunity to view him.  Thus, she was not paying attention to the robber and made her photo array identification based upon seeing security footage on television.  To this point, she was not very confident in selecting Passineau out of the photo array.

But because prong one, whether the photo array was unnecessarily suggestive, was not met as to each witness, their identifications will not be suppressed.  In addition, as noted, there is no substantial risk of misidentification in this case.  And ultimately, the jury is the decisionmaker on the credibility of the eyewitnesses and how much weight to give their testimony.  Therefore, considering the totality of the circumstances for each photo identification, they were neither the product of unnecessarily suggestive procedures nor involved a substantial risk of misidentification, and the photo array identification evidence will not be suppressed.

### 4.  The photo array evidence is relevant and not unfairly prejudicial.

Having concluded that the procedure use by the PPD during the photo arrays was constitutionally sound, the Court will now address Defendants' arguments under the Federal Rules of Evidence.  First, evidence is relevant if it has "any tendency to make the existence of a fact that

is of consequence to the determination of the action more or less probable than it would be without the evidence." United States v. Corbin, Cr. Nos. 10-352-02, 10-352-03, 2011 WL 210831 at *3 (E.D. Pa. May 26, 2011) (citing Fed. R. Evid. 401). It is clear in this case that the photo array identifications are relevant because they tend to show who committed the Smith Pharmacy Robbery. Second, under Federal Rule of Evidence 403, the Court may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. The identification evidence here is relevant because it is probative of who committed the Smith Pharmacy Robbery, and its probative value is not substantially outweighed by the danger of unfair prejudice. And the strength of the identifications can be addressed on cross-examination and is for the jury to determine. Therefore, the evidence of the photo arrays will not be suppressed.

### B. Motions to Suppress Cellphone Records based on Franks v. Delaware.

Defendants also move to suppress the cellphone information obtained from the search and seizure of their respective T-Mobile cellphones. (See Doc. No. 44.) (See also Doc. No. 47.) Both Defendants argue that the affidavits of probable cause attached to the search warrants contain knowingly false and misleading information about the photo arrays. (See Doc. No. 47 at 2 ¶ 8.) (See Doc. No. 44 at 5 ¶ 16.) Specifically, Passineau objects to the following regarding his identification evidence:

1. The affidavit states that Diana Cologne positively identified him as the robber when in actuality she said "he looks most like the guy" and "he is the closest." (Doc. No. 244 at 10-11.) Further, she never circled yes that she recognized the robber and the affidavit omits this information. (Id.)

2. The affidavit claims that Christina Soto "instantly" identified Passineau and that she was "confident" he was the robber. (Id. at 11.) Later, she testified at the preliminary hearing that she did not say that. (Id.)

3. The affidavit does not state that Maritza Rivera saw the surveillance footage on television and not on the cameras in the Smith Pharmacy. (Id. at 12.) Further, the affidavit omits that Rivera did not circle "yes" that she did not identify the robbers. (Id.)

On the other hand, after incorporating his arguments made in his Motion in Limine (Doc. No. 43), Suggs further asserts that the description of Melonise Lynch's identification as described in the affidavit is misleading because "it is painfully clear that no one would be able to make an identification based upon [her] limited ability to view the robber." (Doc. No. 44 at 5.)

Further, Defendants claim that the phone conversation between Detective Liebsch and Detective McCullion was intentionally misrepresented in the search warrant affidavit because it states that Detective McCullion "recognized" Defendants in the Smith Pharmacy security footage when in reality he only said they "appeared" to be Defendants. (Doc. No. 244 at 10.) (Doc. No. 246 at 2.) In response, the Government contends that these assertions do not amount to a false statement requiring suppression under Franks. (Doc. No. 243 at 6 n.2.)

### 1. Standard of Review under Franks v. Delaware

In Franks v. Delaware, the United States Supreme Court held that where a defendant makes a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." 438 U.S. 154, 156 (1978). Here, the Court granted Defendants' request for a Franks hearing and hearings were held on February 17 and July 25, 2022. (See Doc. No. 200, 229.)

At the hearing, Defendants had to establish by preponderance of the evidence that the search warrant contained knowing and intentional false statements. United States v. Grimes, Cr. No. 16-59, 2022 WL 1044054 at *5 (E.D. Pa. April 7, 2022) (citing Franks, 438 U.S. at 156-57). If this burden was met, Defendants then had to show that "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause." Id. Thus,

"the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." Id. "Accordingly, in order to void the warrant and suppress the evidence, [Defendants] must show both 1) that bad faith or reckless disregard existed on the part of the affiant, and 2) that there would have been no probable cause but for the incorrect statement." Id. (citing United States v. Shields, 458 F.3d 269, 276 (3d Cir. 2006) (citing cases)).

> **2. The search warrant affidavit does not contain knowing and intentional false statements.**

Neither Suggs nor Passineau have established by a preponderance of the evidence that the statements in the search warrant affidavit were knowing or intentional misrepresentations. In their respective Motions, each Defendant submits that the following statements were knowingly and intentionally misrepresented: 1) the information that Detective McCullion was able to "recognize" Suggs and Passineau as the robbers based on watching the surveillance video and 2) the information in the affidavit relating to the photo arrays. (Doc. No. 244 at 10-12.) (Doc. No. 246 at 1-3.)

As to Detective McCullion, his ability to identify the robbers in the surveillance footage was not knowingly and intentionally misrepresented in the search warrant affidavit. The beginning of the affidavit clearly states that the robbers were wearing masks. Later in the search warrant, it states that Detective McCullion saw the surveillance footage of the robbery on the PPD YouTube Channel. From the video, it is evident Detective McCullion could see portions of Defendants' faces that were not covered by the mask. Additionally, the search warrant affidavit explains that Detective McCullion previously knew Defendants' identities because they were suspects in the Castor Pharmacy Robbery. The two robberies are noticeably similar and Suggs allegedly wore the same grey sweatshirt in the Castor Pharmacy Robbery as the Smith Pharmacy Robbery. See

United States v. Suggs, Cr. No. 19-00629, 2022 WL 2168356 at *3 (E.D. Pa. June 16, 2022) (noting the similarities between the Smith and the Castor Pharmacy Robberies). The fact that the search warrant said that Detective McCullion "recognized" Defendants rather than "it appeared to be Defendants" does not amount to a false statement.

As to Suggs's argument related to the identification by Melonise Lynch, the Court has already discussed at length that the photo array procedure used by the PPD was not unnecessarily suggestive. Additionally, in the affidavit, Detective Green accurately detailed what Melonise Lynch told Detective Bender during her photo array. Thus, the statements in the search warrant affidavit related to Melonise Lynch's identification were not knowingly and intentionally mispresented.

Moreover, Passineau has not established that the statements in the affidavit regarding the photo arrays were knowing and intentional misrepresentations. First, as to Diana Cologne, nothing in the search warrant affidavit leads the reader to believe that she made a categorical identification. There, the language clearly and accurately states that she made a comparison among all six photos and what her conclusions were. Further, the fact that the magistrate authorizing the search did not know that Diana Cologne did not circle "yes" on the form filled out after the showing of the photos does not affect the determination of probable case, given that her correct response was properly recorded.

Second, the arguments related to Christina Soto's preliminary hearing testimony are addressed above. Although she did not remember what she said a few months after the robbery took place, this does not mean that, at the time, her identification was false and misleading. Finally, even though Maritza Rivera viewed the video on television and not on the security cameras, this does not affect the probable cause determination. The point was communicated that

she did not see the robbery as it proceeded, but rather saw the robbers on video afterward.  As a result, similar to Diana Cologne, the fact that the judge did not know that Maritza Rivera did not circle "yes" does not affect the probable cause determination.  The statements are in no way false or misleading.[21]

## IV.     CONCLUSION

For the above reasons, Defendants' Motions (Doc. Nos. 43, 44, 46, and 47) will be denied. An appropriate Order follows.

---

[21] Because Defendants have not shown that there were knowing and intentional misrepresentations in the search warrant affidavit, the Court need not further address whether there was probable cause to search.  See United States v. Shields, 458 F.3d 269, 276 (3d Cir. 2006).