IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

v.

JOHN SUGGS et al.,

Defendants.

CRIMINAL ACTION
NO. 19-00629

## OPINION

**Slomsky, J.**                                                                                     **July 21, 2023**

### TABLE OF CONTENTS

**I.   INTRODUCTION** ......................................................................................................... 1

**II.  BACKGROUND** ........................................................................................................... 3

   **A.   Trial Evidence Regarding the Castor Pharmacy Robbery** ........................................ 3

     1.   Testimony of Federal Bureau of Investigation Special Agent Joseph Donahue ........... 3

     2.   Surveillance Footage and Testimony of Tim Monahan ................................................ 3

     3.   Testimony of Co-Conspirator Rashonda Henry, the Getaway Driver ........................... 5

     4.   Testimony of Co-Conspirator Khalil Werts, the Lookout ............................................ 7

     5.   Cell Site Data Analysis by Special Agent William Shute ........................................... 10

   **B.   Trial Evidence Regarding the Smith Pharmacy Robbery** ........................................ 13

     1.   Testimony of Special Agent Joseph Donahue ............................................................ 13

     2.   Surveillance Footage ................................................................................................. 13

     3.   Eyewitness Testimony ............................................................................................... 15

       a.   Yarelis Torres ....................................................................................................... 15

i

      b.    Dayana Colon........................................................................... 17

      c.    Melonise Lynch ...................................................................... 18

      d.    Steven McShane ..................................................................... 19

    4.    Special Agent Joseph Donahue's Testimony about the Firearm.................................. 20

    5.    Testimony of Robert Kehs, Operations Manager
        at Steven Kempf Building Materials........................................................ 22

    6.    Cell Site Data Analysis by Special Agent William Shute ............................... 23

    7.    Traffic Stop of Tameer Miller, the Getaway Driver ...................................... 24

  **C.    Search of Defendant John Suggs's House**................................................. 26

  **D.    Information Obtained from Extraction Report
       of Defendant John Suggs's Cell Phone**................................................... 28

**III. STANDARD OF REVIEW**.......................................................................... 30

  **A.    Rule 29 Motion for Judgment of Acquittal**................................................ 30

  **B.    Rule 33 Motion for New Trial**............................................................ 31

**IV. ANALYSIS**...................................................................................... 32

  **A.    Suggs's Motion for Judgment of Acquittal on Count Four Will Be Denied
       Because Sufficient Evidence Supports His Conviction**.................................. 32

  **B.    Passineau's Motion for Judgment of Acquittal on Counts Three and Four
       Will Be Denied Because Sufficient Evidence Supports His Convictions** ................. 38

    1.    The Sufficiency of the Evidence on Count Three......................................... 38

    2.    The Sufficiency of the Evidence on Count Four ......................................... 40

  **C.    Passineau's Motion for a New Trial on Counts One, Three,
       and Four Will Be Denied**................................................................ 41

1.    Joinder of Suggs and Passineau Did Not Create a Danger
of a Miscarriage of Justice ............................................................ 44

2.    Joinder of Both Robberies Did Not Create a Danger
of a Miscarriage of Justice ............................................................ 48

**V.  CONCLUSION** ................................................................................. 49

## I.      INTRODUCTION

This criminal case involves the robberies of two pharmacies located in Philadelphia, Pennsylvania. On October 19, 2017, Castor Pharmacy was robbed. On February 22, 2018, Smith Pharmacy was robbed. Theft of narcotic drugs was the objective of both robberies. On March 5, 2020, after several months of investigation by local and federal law enforcement officials, a grand jury returned a Superseding Indictment against Defendants John Suggs and Nickolas Passineau charging them with two (2) counts of interference with interstate commerce by robbery, in violation of 18 U.S.C. § 1951(a) ("Hobbs Act robbery"), and two (2) counts of using or carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c). The robbery and firearm charges arising from the Castor Pharmacy robbery were alleged in Counts One and Two, respectively. The robbery and firearm charges arising from the Smith Pharmacy robbery were alleged in Counts Three and Four, respectively.[1] On August 31, 2022, well before the trial of Suggs and Passineau on Counts One, Three, and Four, the Count Two gun charge relating to the Castor Pharmacy robbery was dismissed. (See Doc. No. 254.)

From December 5 to 9, 2022, a five-day jury trial was held. After closing arguments, the Court gave the jury the following instructions:

> [I]n our system of justice, guilt or innocence is personal and individual. You must separately consider the evidence against each Defendant on each offense charged and you must return a separate verdict for each Defendant on each offense.

> For each Defendant and offense you must decide whether the Government has proved beyond a reasonable doubt that the particular Defendant is guilty of the particular offense.

---

[1] The grand jury also indicted Russell Williams and Khalil Werts for their role in the Castor Pharmacy robbery, and Tameer Miller for his role in the Smith Pharmacy robbery. Williams and Werts were lookouts in the Castor Pharmacy robbery. Miller drove the getaway car in the Smith Pharmacy robbery. All three pled guilty prior to the trial of Suggs and Passineau.

Your decision on any one Defendant or any one offense, whether guilty or not guilty, should not influence your decision on any other Defendant or offense. Each offense and each Defendant should be considered separately.

(Doc. No. 303 at 176-77.)

Both Suggs and Passineau were found guilty of the Hobbs Act robbery charge in Count One regarding the Castor Pharmacy robbery, and the Hobbs Act robbery charge in Count Three regarding the Smith Pharmacy robbery. In addition, they were found guilty of the gun charge in Count Four for using and carrying the firearm during the Smith Pharmacy robbery. In a special interrogatory, the jury also found Suggs had brandished a firearm when committing the Smith Pharmacy robbery.

The jury considered a variety of evidence in reaching its verdict: testimony from expert witnesses, eyewitnesses, two co-conspirators cooperating with the Government, security camera footage, cell tower location data, text messages from Defendants, and reports filed with the Drug Enforcement Administration ("DEA") detailing the quantities and types of drugs stolen from the Castor and Smith Pharmacies. Additional evidence set forth below also was presented.

Before the Court are Defendant Suggs's Motion for Judgment of Acquittal (Doc. No. 284) and Passineau's Motion for Judgment of Acquittal and Motion for a New Trial (Doc. No. 285).[2] Suggs seeks acquittal only on Count Four regarding the Smith Pharmacy robbery. He is not moving for a new trial. Passineau seeks acquittal on Counts Three and Four regarding the Smith Pharmacy robbery and a new trial on all three Counts of the Superseding Indictment.

---

[2] Passineau's Motions collectively are titled "Post Trial Motions for Judgment of Acquittal and/or a New Trial." (Doc. No. 285.) For convenience, the Court will refer to each individual Motion as "Motion for Judgment of Acquittal" and "Motion for a New Trial."

## II.      BACKGROUND

### A.      Trial Evidence Regarding the Castor Pharmacy Robbery

#### 1.      Testimony of Federal Bureau of Investigation
####           Special Agent Joseph Donahue

Federal Bureau of Investigation ("FBI") Special Agent Joseph Donahue ("SA Donahue")

investigated both the Castor and Smith Pharmacy robberies.  Since September 2015, SA Donahue

has worked for the FBI and is assigned to the Violent Crimes Task Force ("VCTF") in the FBI's

Philadelphia Field Office.  (Id.)  As a member of the VCTF, he investigates "carjackings, robberies,

kidnappings, bank robberies, and other firearms offenses."  (Id.)

Some time after the Castor Pharmacy robbery, the Philadelphia Police Department ("PPD")

sent SA Donahue several items:  (1) pictures of Castor Pharmacy taken after the pharmacy was

robbed, (2) surveillance video footage from a nearby church that depicted "video from the

alleyway behind the 6400 block of Castor Ave," and (3) surveillance footage captured from

cameras located inside Castor Pharmacy.  (Id. at 56-57.)  About three to four minutes of video

footage was captured on the church's camera, and about an hour of footage from "four or five

camera angles" located inside and outside Castor Pharmacy.  (Id. at 57-58.)  SA Donahue "used a

computer program" to "make a compilation video" of all the surveillance footage of the Castor

Pharmacy robbery.  (Id. at 58.)  He "specifically selected scenes from the robbery that [he] thought

were pertinent, and [he] also added certain things like a red arrow or a box with text to draw

attention to the things that [he] . . . thought were important to the case."  (Id. at 59.)

#### 2.      Surveillance Footage and Testimony of Tim Monahan

Footage from a camera located inside Castor Pharmacy taken on October 19, 2017 at about

9:23 a.m. shows Tim Monahan, the owner of the pharmacy, in an area of the pharmacy behind a

locked door that is closed to the public.  (See Doc. No. 300 at 62, 92, 95.)  At the same time, a

black male wearing a black sweatshirt is seen looking into the pharmacy while walking toward the main entrance.  (Id. at 63.)  The male then entered the pharmacy.  (Id.)  Monahan testified at trial that he saw the man wearing a black face mask break down the locked door in front of the prescription area and run toward him while wielding a firearm.  (Id. at 93, 96-97.)  The man then struck Monahan with the firearm, damaging his ear and knocking him to the ground.  (Id. at 93, 108.)  The man struck Monahan another three times while he was still on the ground.  (Id. at 97-98.)[3]

Surveillance footage from cameras inside Castor Pharmacy shows two other males then enter the pharmacy.  One of them was wearing a black face mask, black gloves, a gray hooded sweatshirt with white drawstrings and white zipper, a pair of burgundy shoes, gray sweatpants, a cellphone in his pants pocket, and white earbuds attached by a cord to his phone and going in his ears.  (Id. at 68.)  The other male was wearing a black hooded sweatshirt.  (Id. at 64.)  Surveillance footage showed his unmasked face as he walked by the pharmacy's front window and also showed him donning his face mask as he was entering the pharmacy.[4]  (Id. at 68.)  The first male wearing the gray hooded sweatshirt and burgundy shoes asked Monahan where in the pharmacy he could find promethazine or codeine.  (Id. at 93, 99.)  After stealing several bottles of prescription medication, including promethazine, Oxycodone, and Percocet, the three robbers left the pharmacy through the back door.  (Id. at 99, 101.)

Later that day, Monahan sent to the Drug Enforcement Agency ("DEA") the form required to be completed by pharmacists whenever controlled substances, such as narcotics, are lost or

---

[3]  This black male was not identified before the statute of limitations for the robbery expired and he was not charged in this case.  He was later identified as Rasheed Black.

[4]  Subsequent evidence about his clothing established that this male was Passineau and the jury found it was him by their verdict.

4

stolen.  (Id. at 103-05.)   Among the drugs stolen were methadone, oxycodone, codeine, promethazine, morphine, Adderall, and Percocet.  (See Gov't Ex. 216.)  The estimated value of the stolen drugs was $6,409.  (Doc. No. 300 at 105-06.)

### 3. Testimony of Co-Conspirator Rashonda Henry, the Getaway Driver

The jury heard testimony from Rashonda Henry.[5]  Henry was the getaway driver for the Castor Pharmacy robbery.  (Id. at 111.)  Henry knew Defendant John Suggs, whom she calls "E," for twelve years and identified him as the individual who planned the robbery of the Castor Pharmacy.  (Id. at 111, 114.)  About two or three weeks before the robbery, Suggs told Henry about his plan to rob a pharmacy, "but he wasn't specific on a location."  (Id. at 114.)  For at least a week before the Castor Pharmacy robbery, Suggs called Henry every day to persuade her to act as the getaway driver.  (Id. at 116.)

Finally, on the morning of the robbery, Henry decided to drive in her Crown Victoria to Suggs's house.  (Id. at 116-17.)  When she arrived at Suggs's residence, four males entered her car.  (Id. at 117.)  She described them as "[o]ne tall guy, one dark-skinned guy, a light-skinned guy, and E."  (Id. at 118.)  She then drove to pick up a "Spanish kid."  (Id.)  When shown by the Government a picture of Defendant Nickolas Passineau (Gov't Ex. 410), Henry identified him as the "Spanish kid" and testified that she had met him one other time prior to the robbery.  (Doc. No. 300 at 119.)  Henry identified the "light-skinned guy" as "Juice."  (Id.; Gov't Ex. 411.)  Later evidence identified "Juice" as Russell Williams, and the "tall guy" as Khalil Werts.

Henry testified that at around 7:00 a.m., as the group of six approached the area around Castor Pharmacy, she dropped off the "tall guy" and the "light-skinned guy" whom she identified

---

[5]   Henry was not charged in this case with participating in the Smith Pharmacy robbery.

as lookouts.  (Doc. No. 300 at 124-25.)  Henry testified that Suggs told those two males which way to walk.  The three men initiated a three-way phone call during which they talked to each other. (Id. at 125.)  Next, Henry proceeded to drive around the area by Castor Pharmacy to look for a place to park.  (Id. at 126.)  After Henry parked, she heard Suggs tell Passineau and the "dark-skinned guy" about the plan to rob Castor Pharmacy and what their roles would be.  (Id. at 127-28.)  While Henry was outside the car on the phone with one of her friends, she saw the three remaining men leave her car.  (Id. at 128.)  When the three men returned, Henry saw them wearing gloves.  (Id. at 129.)

Henry drove the three men back to her house.  (Id. at 132.)  She did not see Juice again, and the "tall guy" went by himself to Henry's house.  (Id.)  When Suggs, Passineau, and the "dark-skinned guy" entered Henry's home, she saw them divvy up the drugs stolen from Castor Pharmacy.  (Id. at 133-34.)  Henry saw Suggs keep more drugs than he gave to Passineau and the "dark-skinned guy."  (Id. at 134-35.)  Suggs offered Henry $10,000 for her involvement.  (Id. at 136.)  Henry gave Suggs a ride to his sister's house, and by the time she returned, Passineau and the "dark-skinned guy" had left her house.  (Id. at 136-38.)  A black hoodie had been left behind. (Id. at 136.)  Henry's brother put the hoodie in the washer because he thought it was hers.  (Id. at 137.)

During direct examination, the Government showed Henry two pictures from Facebook that she identified as pictures of Suggs.  (Id. at 140-42; Gov't Exs. 403, 404.)  In both pictures, Suggs is seen wearing a construction vest and a gray hardhat.[6]  (See Gov't Exs. 403, 404.)  Next,

---

[6]  Although no discernible logos appear on the construction vest and hardhat, as noted supra, Suggs worked for Steven Kempf Building Materials starting some time in September 2016 and worked there for four or five weeks.  (See Doc. No. 301 at 184, 187).  The Facebook pictures of Suggs wearing the hardhat and construction vest were posted on October 4, 2016.  (See Gov't Exs. 403, 404.)  Furthermore, during a lawful search of Suggs's apartment two months after the

the Government played for Henry surveillance footage of the Castor Pharmacy robbery.  The

following exchange took place:

> Q.  [Assistant United States Attorney Everett Witherell ("AUSA Witherell"):]  Ms. Henry, I'm going to have you watch this for a minute.  Two people are going to come into the pharmacy.  If you know who they are, I want you to let me know. Okay?
> A.  [Rashonda Henry:]  All right.
> Q.  The person in the grey, do you know who that is?
> A.  Yes.
> Q.  Who is that?
> A.  E.
> Q.  How do you know it's E?
> A.  I just know him.  I've been hanging with him for years.  I just -- his body build, the way he walk.
> . . .
> Q.  We see three people.  Now the person -- pause it right -- hold on.  Let's wait till we see a little bit of that sweatshirt.  Right there.  You see the three people in this video?
> A.  Yes.
> Q.  A minute ago you identified that person as E.  The one all in black, do you know who that was?
> A.  That's the dark-skinned kid.
> Q.  Short black guy?
> A.  Yeah.  Short black guy.
> Q.  The guy with the sweatshirt that has the writing that appears to be the same one that you gave to [a federal law enforcement officer], do you know who that is?
> A.  That's the Spanish kid.

(Doc. No. 300 at 142-43.)[7]

### 4.    Testimony of Co-Conspirator Khalil Werts, the Lookout

The jury also heard the testimony of Khalil Werts, who was one of the two lookouts during

the Castor Pharmacy robbery and who was referred to by Henry as the "tall guy."  Werts testified

that he committed the robbery with Suggs, Passineau, Henry, Russell Williams, and Rasheed

---

Smith Pharmacy robbery, police seized a gray hardhat with a sticker displaying "Steven Kempf Building Materials."  (See Gov't Exs. 513, 515.)

[7]    As noted earlier, Passineau was identified as the robber wearing the black hooded sweatshirt.

Black.[8]   (Doc. No. 301 at 14-15.)  Werts made in-court identifications of Suggs and Passineau.  (Id. at 15-17.)  Werts testified that Suggs approached him about robbing a pharmacy, but Werts "told him it was a bad idea" because robbing a pharmacy "brings cops."  (Id. at 18-19.)  A few days later, Suggs approached Werts with an idea to rob a drug dealer.  (Id. at 19.)  Werts agreed to help.  (Id.)  On the night before the Castor Pharmacy robbery, Werts, Suggs, and Rasheed Black met at Werts's house to discuss the plan to rob the drug dealer.  (Id. at 19-20.)  Suggs also told Werts to meet him at his house on Yocum Street and to bring with him a facemask.  (Id. at 21.)

On the morning of the Castor Pharmacy robbery, Werts and Black walked together to Suggs's house on Yocum Street.  (Id.)  Werts brought a facemask, and Black brought ski masks.  (Id.)  Werts testified that when he arrived at Suggs's house, he saw Suggs wearing a gray sweatsuit and burgundy shoes, the same outfit depicted on surveillance footage from inside Castor Pharmacy during the robbery.  (Id. at 22-23.)  Werts testified that, at "around 6:00 or 7:00," everyone entered Rashonda Henry's car and "got on I-95 to go up to northeast."  (Id. at 23-24.)

During the drive, Werts was listening to music and did not hear most of the conversations in the car.  (Id. at 24-25.)  When Henry started driving on Castor Avenue in the area of Castor Pharmacy, Werts heard Henry telling Suggs that there were cameras around.  (Id. at 25-26.)  Werts still thought he was robbing a drug dealer, but believed that there were "going to be cops" nearby.  (Id. at 26.)  Werts testified that Henry was driving in circles around Castor Avenue and driving up and down alleyways.  (Id. at 26-27.)  When Henry had "parked on the side street across from where Castor is at," Werts told Suggs that he was not going to help him rob the drug dealer.  (Id. at 26.)

---

[8]   Henry had identified Suggs, Passineau, and Juice, who were depicted in Government Exhibits 409, 410, and 411, respectively.  Werts is depicted in Government Exhibit 413.  Werts identified the individual depicted in Government Exhibit 412 as Rasheed Black.  Russell Williams is Juice's real name.  He was the second lookout.

Suggs told Werts to be a lookout for what Werts still believed was the robbery of a drug dealer and not of a pharmacy. (Id. at 26-27.) He agreed to be a lookout. (Id.) Werts testified that he tried walking away from the Castor Avenue area, but that Suggs had called him by cell phone to ask whether he saw any cops in the area. (Id. at 28.) Suggs told Werts that he would call him right back, and when Suggs did call Werts back, Suggs told him that Juice also was on the call. (Id. at 28-29.) Their phone call lasted about five or six minutes. (Id. at 29.) Then, "[t]he phone just went dead." (Id. at 30.)

After Castor Pharmacy was robbed, Werts saw Suggs, Passineau, and Black running away from him and entering Henry's car. (Id. at 32.) They left the area without him. (Id.) Werts called Suggs, who told Werts to meet him at "D and Wyoming," where Rashonda Henry's house is located. (Id. at 33.) Werts took the bus to Henry's house and testified that Suggs, Passineau, Henry, Black, and Juice all were at Henry's house when he arrived. (Id.) Upon his arrival, Werts observed that they all had plastic bags and were getting ready to leave. (Id. at 33-34.) Suggs promised that he would pay Werts for his involvement in what he still believed was the robbery of a drug dealer. (Id. at 35.) For the next several days, Werts argued with Suggs and demanded that he be paid for helping with the robbery. (Id.) Werts testified that Suggs came to his house and told him to turn himself in because Suggs believed that Henry was cooperating with the police. (Id. at 36-37.)

At trial, Werts was shown the surveillance footage of the three individuals entering Castor Pharmacy during the robbery. (Id. at 30-31.) Werts identified the male wearing the gray sweatshirt and burgundy shoes as Suggs and the individual wearing all black clothing as Rasheed Black. (Id. at 31-32.) Werts identified the third individual as Passineau. (Id.)

In February 2018, Werts saw a video posted on Facebook that depicted surveillance footage of the Smith Pharmacy robbery and the robbers.  (Id. at 40-41.)  Werts recognized Passineau in the surveillance footage of the Smith Pharmacy robbery because he did not have a mask over his face before walking into the pharmacy, and he recognized Suggs because he recognized Suggs's "build" and "mouth."  (Id. at 41-42.)  After seeing the Facebook video, Werts called Suggs, who told Werts that Passineau "was stupid for not having his mask on."  (Id. at 41.)  Werts demanded Suggs pay him for his involvement in the Castor Pharmacy robbery or else he intended to blackmail Suggs with the Facebook video of the Smith Pharmacy robbery.  (Id. at 42.)  Suggs said he was going to call Werts back, but he never did.  (Id. at 43.)

### 5.    Cell Site Data Analysis by Special Agent William Shute

The jury also heard testimony from FBI Special Agent William Shute ("SA Shute"), who is a member of the FBI's Cellular Analysis Survey Team ("CAST").  SA Shute has been employed with the FBI for twenty-seven (27) years, starting first as an Investigator Specialist to aid in surveillance operations.  (Doc. No. 303 at 13.)  He then became a Special Agent in 2000.  (Id.)  At the time of trial, SA Shute was assigned to CAST.  (Id. at 14.)  CAST was created in 2012, but SA Shute was a member since 2010 of the team that eventually became CAST.  (Id. at 15.)  CAST is responsible for "geographically locating [cell phones], analyzing records, sort of taking and utilizing the data generated as a result of your cell phone calls, and then being able to depict that on a map."  (Id. at 14-15, 21.)

As SA Shute explained at trial, there are two types of cell towers:  (1) three-sector towers and (2) distributed antenna system ("DAS") cell sites.  (Id. at 29-32.)   Three-sector towers comprise approximately ninety-six (96) percent of all cell towers in the country.  (Id. at 29, 31.)  As the name suggests, these towers provide coverage in three 120-degree arcs.  (Id. at 29-30.)  The

three-sector towers have a coverage range of about "four-tenths of a mile to about six-tenths of a mile." (Id. at 64.)  DAS cell sites are "low-powered omnidirectional cell sites" that "emit their signals in 360 degrees."  (Id. at 31.)  The DAS sites have a "coverage range of about a quarter of a mile to three-tenths of a mile."  (Id. at 39.)

Every time a cell phone uses a cell tower, i.e., to send a text message or to place a phone call, that data is received by the company that provides cell service to the phone, such as T-Mobile or AT&T.  (Id. at 20.)  That data gets input into a call detail record which "shows the cell site and sector of the cell site that your phone utilized at the inception of that call, when that call began" as well as the sector of the cell site the phone used at the "termination of the call."  (Id. at 20-21.) Cell site analysis, also known as call detail record analysis, allows members of CAST, such as SA Shute, to determine "an approximate geographical area where that phone is at that given time." (Id. at 26.)

SA Shute performed cell site analyses on cell phones numbers attributable to Defendants Suggs and Passineau, Khalil Werts, Rashonda Henry, and Russell Williams (or "Juice").[9]  (Id. at 27.)  Between 6:00 and 7:00 a.m. on the morning of the Castor Pharmacy robbery, the phones of Suggs, Passineau, Werts, Henry, and Williams were all in the vicinity of Suggs's residence located at 6135 Yocum Street, Philadelphia, Pennsylvania.[10]  (Id. at 34-35.)  Between 7:00 and 7:15 a.m., the phones attributable to Suggs, Werts, and Williams all were traveling away from Suggs's

---

[9]  SA Shute also did a cell site analysis using the cell phone number attributable to Tameer Miller, who was only involved in the Smith Pharmacy robbery.

[10]  To put it in cell site analysis terms, each of these phones was using three-sector towers that provided coverage to Suggs's residence.  (Doc. No. 303 at 35.)

residence and toward the direction of Castor Pharmacy.[11]  (Id. at 36-37.)  Between 7:21 and 8:00 a.m., the cell phones attributable to Suggs, Werts, and Williams were in the vicinity of Castor Pharmacy.  (Id. at 38-39.)  At around 7:50 a.m., the cell phones attributable to Suggs, Werts, and Passineau were using cell towers that provide service to Castor Pharmacy.  (Id. at 41.)  Up until the Castor Pharmacy robbery, each cell phone was using cell towers that cover Castor Pharmacy.  (See Gov't Ex. 701a at 12.)

Call detail records also show that there was a three-way phone call between Suggs, Werts, and Williams's phones starting at 9:00 a.m. and ending at about 9:22 a.m., which is two minutes after the Castor Pharmacy was robbed.  (Doc. No. 303 at 46-48.)  At 9:09 and 9:10 a.m., Passineau's phone twice called Castor Pharmacy.  (Id. at 49.)  Then, just minutes after the Castor Pharmacy robbery, which began at 9:20 a.m., Suggs, Passineau, and Henry's phones left in the same direction and eventually ended up at Henry's house at around 9:40 a.m.  (Id. at 42-43.)  Werts's phone used cell towers providing service to Henry's house at around 10:13 a.m., over a half hour after the other phones used those towers.

The description of the cell site evidence produced at trial concludes the evidence presented regarding the Castor Pharmacy robbery.  The Court will now describe the evidence produced at trial regarding the Smith Pharmacy robbery.

---

[11] When cell phones are not currently being used, they do not produce data that appears in a call detail record.  (Id. at 37.)  The phones attributable to Passineau and Henry were not being used during this time period.

### B.   Trial Evidence Regarding the Smith Pharmacy Robbery

### 1.   Testimony of Special Agent Joseph Donahue

SA Donahue started investigating the February 22, 2018 robbery of Smith Pharmacy while he was still investigating the Castor Pharmacy robbery. (Doc. No. 301 at 93.) SA Donahue testified that the Smith Pharmacy robbery

> became part of [his] investigation because there were some similarities between the two, in particular, there were multiple actors. One of them was a Black male. The other one was a light-skinned male, possibly Hispanic. There was similar clothing. They were takeover robberies of pharmacies, and narcotics were stolen.

(Id.) Like his investigation of the Castor Pharmacy robbery, SA Donahue's investigation of the Smith Pharmacy robbery initiated when he received pictures of the pharmacy after it was robbed as well as surveillance footage captured during the robbery. (Id. at 93-94.) SA Donahue also received bodycam footage from two police officers who, as will be described below, conducted a traffic stop of co-Defendant Tameer Miller. (Id. at 94.) SA Donahue created a compilation video and added to the video symbols or text boxes similar to those he added to the compilation video of the Castor Pharmacy robbery. (Id.)

### 2.   Surveillance Footage

On February 22, 2018 at 11:18 a.m., video footage taken from surveillance cameras located in the vicinity of Smith Pharmacy shows a Dodge Charger about a block away from the pharmacy "that has crossed the center line" and "is making a U-turn to park." (Id. at 96.) On the video played to the jury, SA Donahue used red arrows to indicate that the front hubcaps of the Charger were silver and the rear hubcaps were black. (Id. at 97.) At around 11:30 a.m., the Charger "parallel park[ed] just past that alleyway that it used to do a three-point turn" and two people wearing green or neon yellow construction vests exit the vehicle. (Id. at 97-98.) The two individuals then walk down several streets in the area surrounding Smith Pharmacy until 11:51

13

a.m. when they first approach the front door of the pharmacy, which is located in the rear of the building where there is a parking lot for customers of Smith Pharmacy and other businesses operating in the building.  (Id. at 99-100.)

Turning next to surveillance footage from a camera inside the pharmacy, SA Donahue explained that "as the two men enter, the first man, the one in the green sweatshirt, does not have his mask on.  So he pauses, turns around, and then pulls his mask up before he enters the store." (Id. at 100.)  The other man who is already wearing a mask that covers "everything but his eyes and mouth" is wearing black Adidas pants and a gray sweatshirt with white drawstrings and a white zipper, similar to the sweatshirt worn by one of the Castor Pharmacy robbers.  (Id. at 101.) The man wearing the gray sweatshirt is holding a firearm in one of his hands.  (Id. at 102.)

Surveillance footage from inside Smith Pharmacy shows Steven McShane, an automated teller machine ("ATM") repairman who testified at trial, approach the locked front door of the pharmacy.  (Id.)  McShane is just outside the door, and the man with the gray sweatshirt is just inside the door with a gun drawn.  (See Gov't Ex. 311.)  The same armed robber is seen pointing a gun at point blank range at Melonise Lynch, a pharmacist who was working at Smith Pharmacy at the time.[12]  (See Gov't Ex. 312.)  At the same time, the other robber is taking drugs from behind the pharmacy and placing them in a bag.  Surveillance footage then shows the other man wearing the green hoodie, whose face was caught on camera while he was outside Smith Pharmacy because he had not yet put on his ski mask, placing prescription drugs located behind the pharmacy's counter into a plastic bag.  (See id.)  The two robbers then exit the pharmacy and run toward the Dodge Charger seen earlier making the U-turn and dropping off the robbers.  (Doc. No. 301 at

---

[12]  The trial testimony of McShane, Lynch, and two other eyewitnesses to the Smith Pharmacy robbery will be discussed in more detail below.

105.)  Before the robber with the gray hoodie entered the car, the Charger's brake lights activated, signaling to SA Donahue that a getaway driver was inside the car.  (Id.)  A still image of the footage displaying the Charger showed that its front hubcaps are silver and the rear hubcaps are black, confirming that it was the same Charger seen earlier on surveillance footage dropping off the robbers near Smith Pharmacy.[13]  (Id. at 107-08.)

### 3.    Eyewitness Testimony

Four eyewitnesses to the Smith Pharmacy robbery testified about their recollection of the events surrounding the robbery.  The first was Yarelis Torres, who was employed by Smith Pharmacy as a pharmacy technician.  The second was Dayana Colon, who was also employed by Smith Pharmacy as a pharmacy technician.  The third was Melonise Lynch, Smith Pharmacy's head pharmacist who was face-to-face with the gun-wielding robber wearing the gray hoodie and just inches away from the firearm.  The fourth was Steven McShane, the ATM repairman seen on surveillance footage outside Smith Pharmacy walking toward the locked front door, where just inside was the gun-wielding robber.

### a.    Yarelis Torres

Yarelis Torres, who was working at Smith Pharmacy during the robbery, testified at trial that two men, one wearing a gray sweatshirt and the other a green sweatshirt, entered Smith Pharmacy and locked the front and side doors.  (Id. at 123.)  The man wearing the gray sweatshirt pulled out a gun.  (Id. at 121.)  Both robbers told everyone to get down on the ground and announced that this "was a robbery."  (Id.)  Torres described them both as wearing black pants, bright green construction vests, masks, and gloves.  (Id. at 122.)  She testified that one was black

---

[13]  As noted supra, the same Charger with Tameer Miller driving was the subject of a traffic stop by Philadelphia Police Officers Jose Borrero and Theodore Brown.

and the other one "seem[ed] kind of Spanish."  (Id. at 122-23.)  Torres testified that one of them

jumped over the counter, she started panicking, and "one of the ladies pulled [her] to the floor."

(Id. at 122.)

Next, both men asked for Oxycontin and "lin," which Torres explained is slang for

promethazine.  (Id.)  While Torres initially testified that the armed man wearing the gray sweatshirt

was black and the man wearing the green sweatshirt was Spanish, she testified at trial that she was

"kind of confused because [she] think[s] the Spanish one is the one in the gray."  (Id.)  Nonetheless,

a few days after the robbery, Torres went to the police station where she was shown an array of

six photographs to identify potential suspects.  (Id. at 128-29; see also Gov't Ex. 308.)  On a form

administered to Torres by a Detective Sam Gonzales, each photograph contained the following

questions   or   prompts:     (1)   "Do   you   recognize   this   person?"   followed   by   a

"Yes" or "No"; (2) "Document exact response."; (3) "Are you confident this is the person that

committed the _____ (insert crime committed)?"; and (4) "Document exact response."  (See

Gov't Ex. 308 at 1-2.)  During Torres's direct examination, the following exchange took place:

> Q.  [Assistant United States Attorney Meaghan Flannery ("AUSA Flannery"):]
> Okay.  And you were shown the six photographs individually?
> A.  [Yarelis Torres:]  Yes.
> Q.  Okay.  And for each photograph, did the detective ask you whether or not you
> recognized the person in the photograph?
> A.  He asked me.
> Q.  Okay.  And for each photograph, what was your response?
> A.  That I didn't see -- I don't recognize anyone.
> Q.  Okay.  And am I correct that during the robbery, you were kind of hiding; is
> that right?
> A.  Yes.
> Q.  And you really didn't get a chance to see the robbers, correct?
> A.  No.
> Q.  So you weren't able to identify them.
> A.  No.

16

(Doc. No. 301 at 131-32.)  During cross examination, Torres testified that she could not see either man's nose or teeth.  (Id. at 133.)  She described both as being tall.  (Id. at 134.)

### b.  Dayana Colon

Dayana Colon, who was working at Smith Pharmacy at the time of the robbery and had her daughter with her, testified that two men wearing construction vests and masks entered the pharmacy.  (Id. at 142-45.)  During the robbery, Colon could not reach her daughter and did not know whether she was safe.  (Id. at 147-48.)  She also testified that one of the men was black and the other was lighter, but she could not tell if he "was White or Spanish."  (Id. at 143-44.)  However, she testified that the black male had the gun.  (Id.)  She testified that the two men were looking for controlled substances.  (Id. at 144.)  When shown surveillance video footage of the robbery from inside Smith Pharmacy, Colon indicated the moment when the armed male pointed the gun at her and ordered her to the ground.  (Id. at 147.)

After the robbery, police came to Colon's residence and conducted a photo array with her. (Id. at 150-51; see also Gov't Ex. 309.)  Colon was shown by a Detective Bender a form identical to the one provided by Detective Sam Gonzales to Yarelis Torres.  (See Gov't Ex. 309.)  For each of the first five photographs, Colon indicated to Detective Bender that she did not recognize them. (Id. at 2-3; Doc. No. 301 at 153.)  But for Photograph #6, which is a picture of Defendant Passineau, although she did not provide a "Yes" or "No" response to Detective Bender, Colon stated "[H]e looks most like the guy."  (Gov't Ex. 309 at 3.)  And after the prompt asking whether Colon is confident that the individual depicted in Photograph #6 is the person that committed the robbery, she stated that "[h]e is the closest."  (Id.)

On cross-examination, Colon testified that when she met with SA Donahue and Assistant United States Attorney Meaghan Flannery on August 17, 2020, almost six months after the Smith

Pharmacy robbery, she told them that she "could not say that the individual in Picture Number 6 was the same person in the video." (Doc. No. 301 at 158.)  Colon was asked by PPD detectives to describe the gun and she said only that it was black. (Id. at 159.)

### c.      Melonise Lynch

Melonise Lynch was working at Smith Pharmacy the day it was robbed. (Id. at 163.)  The day of the robbery was her "first day working at [that] location for the full day.  [She] was per diem at the other location . . . ." (Id. at 166.)  She saw two men enter the pharmacy and described one as black and the other as either Spanish or White. (Id. at 164.)  Lynch confirmed that only the black male was armed. (Id. at 164-65.)  Lynch also testified that both men were wearing "half-masks" in that "[t]he lips were out in the mask but just covering the nose." (Id. at 164.)  After the black male approached Lynch and asked her where the promethazine was kept, she testified that she "recall[ed] screaming at him, and he held a gun to my -- to my head, to my face." (Id. at 165.)  Although she did not remember the exact words she said to the robber, she said something "like why are you doing this . . . like, why on my day, why are you doing this." (Id. at 167.)  Lynch stated that the robber did not say anything to her, but the two "just kind of looked into each other's eyes." (Id.)  A still image of the surveillance footage shows the black male wearing the gray hoodie aiming a gun at Lynch's head at point blank range. (See Gov't Ex. 312.)

Lynch continued by stating that the black male was ordering the other male "to take the drugs and put them into the bag" and that the other male "looked nervous.  And [she thought] he was just moving so slow.  That's why [the black male] just asked one of the girls to help because he was grabbing like one bottle, like one per one, and it was just taking up too much time . . . ." (Doc. No. 301 at 164, 168.)  When shown a photo array to identify the two suspects, Lynch was not able to identify Passineau because the robbers were wearing masks. (Id. at 174-75.)  But when

18

she saw Suggs's photo, she said "[t]hat one.  His lips look a little more fuller then [sic] what I recall."  (Id. at 171-72; Gov't Ex. 306 at 2.)  When asked if she was confident that Suggs committed the robbery, Lynch stated:  "Out of the six photos, if I had to put money on it, it would be him." (Gov't Ex. 306 at 2.)

### d.    Steven McShane

Steven McShane was an automated teller machine ("ATM") repairman who had visited Smith Pharmacy at least half a dozen times to repair its ATM.  (Doc. No. 302 at 10-11.)  McShane also is a gun enthusiast, has had a license to carry a firearm for at least a dozen years, and owns several handguns, including "a couple of Glocks, a couple Springfields, [and] a few Rugers . . . ." (Id. at 13.)

On February 22, 2018, the date of the robbery, McShane noticed that the door was locked and when he looked inside, he saw "a girl sprawled out on the floor."  (Id. at 11.)  Every other time he visited Smith Pharmacy to repair its ATM prior to the robbery, the front door had been unlocked.  (Id. at 11.)  "[L]iterally within a second [after he saw the girl on the floor,] somebody had come around the door -- to the door, pointed a firearm in [his] face, and what I remember, waved me in."  (Id.)  McShane said the man was wearing a mask and a construction vest.  (Id. at 12.)  As the armed man was looking "down for the lock, [McShane] proceeded to duck down in between a couple of cars and get out to the main road and get out of [his] vehicle to be able to make a phone call."  (Id. at 11-12.)

At trial, McShane provided a description of the firearm he saw the man on the other side of Smith Pharmacy's front door point toward him:

Q.  [AUSA Flannery:]  Can you describe what's happening here?
A.  [Steven McShane:]  I was pulling on the door and it was locked.  And that's --
I didn't quite see him come around the corner, I don't think, at that point, because

there was a little bit of glare on the -- on the door.  But that looks like -- yeah, that looks like a Glock.

Q.  Can you --

A.  That's what I thought it was.

Q.  I'm sorry, I didn't hear the last part.

A.  That's what I thought it was.  It appeared like it was a Glock firearm.

Q.  Can you tell me why you thought it was a Glock as opposed to some other firearm?

A.  Just they're blocky in nature.  They have a rectangular stock that's more squared off than most guns.  A lot of guns are rounded.

Q.  I see.

A.  That one's more square.  Looks like a Glock.

(Id. at 16-17.)

### 4.      Special Agent Joseph Donahue's Testimony about the Firearm

The Government showed SA Donahue a still image of the Smith Pharmacy robber wearing

the gray hoodie with his arms outstretched and holding a firearm.  (Id. at 51; Gov't Ex. 314.)  The

following exchange took place during SA Donahue's redirect testimony:

Q.  [AUSA Flannery:]  . . . Agent Donahue, what type of gun is that?

A.  [SA Donahue:]  A Glock.

Q.  And what's that based on?

A.  So I owned Glocks for about six or seven years.  I've been issued them.  My father was a police officer, owned Glocks, so I saw it growing up.  And one of the Glocks that I actually own is a Glock .43, which appears similar to that one.

In particular, looking at the rear sight, that appears to be the standard Glock rear sight which comes as a -- as a white kind of bar with little tabs on the end for aiming.  Whereas, like, for instance, this Taurus nine millimeter, it has two posts at the back.

So one of the things in particular to Glocks that I know, specific Glocks, and compared with this Taurus is the rear set is different.

Q.  Thank you.  And we heard some testimony from Mr. McShane about the shape of a Glock.  Can you speak to that a little bit?

A.  Yes.  So if you look -- try and point so everybody can see.  If you particularly on the front, but . . . it almost comes to a 90-degree angle[].  Whereas, this is rounded off.  The barrel seems more exposed.  Whereas, in the Glock, the barrel is completely encased in the slide on top.

(Doc. No. 302 at 51-52.)

In addition, the Government presented to SA Donahue and the jury text messages found on Suggs's phone sent on November 19, 2017 to a contact named "Chrizzy Valentino." (Doc. No. 301 at 242; Gov't Ex. 806b at 3.) The text messages read as follows:

> Chrizzy Valentino: "Yo bro I don't know if you busy or not just know I got mad love for you. Like I tell you all the time you gotta do what you gotta do and get TF out of Philly. Shit ain't fair out there no more. A nigga see you shining and that gives them enough reason to take it away from you. . . ."
>
> Suggs: "Bro let em come u know I'm ready for what ever in [sic] I always got my bitch on me if a nigga think they got one up me they gone get left . . . ."

(Id.) SA Donahue was found to be qualified as an expert to opine that "bitch" as used by Suggs refers to a gun and that the text messages means that Suggs is always carrying a gun with him.[14]

(Doc. No. 301 at 246-47.)

---

[14] SA Donahue testified that during his time with the Violent Crimes Task Force, he has "investigated dozens of violent crimes[,] . . . reviewed at least 100 phone downloads and dumps. [He's] listened to hundreds of hours of prison calls and reviewed thousands of pages of emails between people in prison." (Doc. No. 301 at 244.)

Furthermore, SA Donahue has investigated over twenty cases involving gun charges and is familiar with the use of coded language to refer to firearms. (Id. at 245.) When asked to describe other instances where coded language is used to refer to a gun, SA Donahue stated the following:

> There can be many different words used for gun. One comes to mind, the popular 50 Cent[] song, [M]y [B]uddy, where he's talking about carrying a Glock. So in that song, 50 Cent[']s talking about carrying a Glock is [sic] his buddy. Looking at the context of this message that Suggs wrote back, when he says, bro, let them come, and then, they going to get left, that would indicate to me that he's welcoming all comers, bro, let them come, and they're going to get left as in something's going to happen to them.

(Id. at 246.) And when asked whether Valentino's message informed his opinion, SA Donahue said:

> [T]he sentence in the middle, where it says, somebody sees you shining, and that gives them enough reason to take it away from you. That indicates that people might try and take stuff from him, and the way you protect yourself from people

### 5.    Testimony of Robert Kehs, Operations Manager at Steven Kempf Building Materials

Detective Donald Liebsch, a member of the FBI's Violent Crime Task Force assigned to the FBI's Philadelphia field office, was one of the detectives investigating the Smith Pharmacy robbery.  (Doc. No. 302 at 55-56.)  Detective Liebsch testified at trial that while he was reviewing the surveillance footage of the Smith Pharmacy robbery, he observed a logo on the construction vest worn by both robbers.  He said that the vests appeared to be turned inside out based on the orientation of the letters in the logo and the interior tag "sticking out."  (Id. at 58.)  Detective Liebsch took still images of the construction vest, "took them to the bathroom mirror" and had other detectives "reverse[] the image."  (Id.)  He saw that the logo said "Steven Kempf."  (Id.)  After searching for "Steven Kempf" on Google, Detective Liebsch found Steven Kempf Building Materials [("Steven Kempf")] located in King of Prussia."  (Id.)  Detective Liebsch went to Steven Kempf and spoke with Robert Kehs, who was employed by Steven Kempf as Operations Manager.  (Id.)  Kehs gave Detective Liebsch a list of employees who could have had a construction vest like the one worn by the Smith Pharmacy robbers.  (Id. at 59.)  John Suggs was included on the list and had an address on the 5400 block of Akron Street, the address noted on the driver's license and certificate of title that had been seized from Suggs's apartment during the execution of a search warrant described infra.  (Id.)

Robert Kehs testified at trial.  As Operations Manager, he was responsible for "warehousing the material, delivery personnel, and fleet personnel, and warehouse personnel." (Doc. No. 301 at 182.)  After viewing a still photograph of the construction vest worn by the Smith

---

taking stuff from you, especially when you're involved in some sorts of activities, could be a gun.

(Id.)

Pharmacy robbers, Kehs confirmed that those vests were "mandatory [to be worn by their] delivery personnel." (Id. at 182-83.) Kehs stated that the vests were given out to Steven Kempf employees starting in 2016 and that employees were not required to return them after they stopped working for Steven Kempf. (Id. at 184.) Kehs also testified at trial that the vests were "strictly for [Steven Kempf] employees" and not something that could be purchased online. (Id. at 183.) Regarding the list he provided to Detective Liebsch of employees who could have received one of the vests, Kehs stated that Suggs was employed by Steven Kempf in September 2016 and worked there for four or five weeks. (Id. at 184, 187.)

### 6.     Cell Site Data Analysis by Special Agent William Shute

SA Shute, who performed cell site data analysis of the phones connected to the Castor Pharmacy robbery, also performed cell site data analysis of the phones attributable to Suggs, Passineau, and Tameer Miller regarding the Smith Pharmacy robbery. (Doc. No. 303 at 49-50.) Between 6:02 and 7:20 a.m., there were several phone calls between Suggs's and Miller's phones. (Id. at 52-53.) During that time, Suggs was at his own residence and Miller was at his mother's residence. (Id. at 52.) And between 6:11 and 9:23 a.m., there were five phone calls between Suggs's and Passineau's phones while they were each at their respective residences. (Id. at 51-52.) During this timeframe, Passineau texted Suggs "3036 hartville st." (See Gov't Ex. 807.) Passineau's residence is 3030 Hartville Street, Philadelphia, Pennsylvania. At 9:53 a.m., Suggs texted Passineau: "Be dress [sic] 5 mins away." (Id.)

At 9:55 and 9:59 a.m., respectively, Suggs called Passineau and was near Passineau's residence at 3030 Hartville Street. (Id. at 53-54.) Then, between 10:24 and 11:00 a.m., Suggs's phone first approached Miller's residence and then left that area and started moving toward Smith Pharmacy. (Id. at 54.) Between 11:13 and 11:35 a.m., all three phones were in the vicinity of

Smith Pharmacy.  (Id. at 55.)  Specifically, at 11:32 a.m., just eighteen minutes before the robbery,

Passineau's phone used a DAS omnidirectional tower which, as discussed supra, "only really has

a coverage range of several blocks.  A few blocks really."  (Id.)  After the robbery, Suggs's phone

moved away from Smith Pharmacy and toward Miller's residence.  (Id. at 56.)  At 12:09 p.m.,

Suggs's phone used a short-range DAS tower that covers Miller's residence, but Miller's phone

did not arrive at that area until an hour after Suggs's phone arrived, indicating that the "phones

[were] not traveling together at the same time."  (Id. at 56-57.)  Passineau's phone did not record

any call details from noon the day of the robbery until February 24, 2022 at 4:54 p.m.[15]  (See Gov't

Ex. 701a at 23.)

### 7.    Traffic Stop of Tameer Miller, the Getaway Driver

Again, Smith Pharmacy was robbed at approximately 11:51 a.m.  Then, at around noon,

Philadelphia Police Department ("PPD") Officer Jose Borrero, along with his partner Officer Kyle

Morris, were driving in their marked patrol car toward Smith Pharmacy.  (Doc. No. 301 at 189.)

Traffic in the area was heavier than usual "because of the police presence due to the robbery."  (Id.

at 190.)  As Officer Borrero got closer to Smith Pharmacy, he noticed "approximately six to eight

vehicles that were stopped at the red light [at the intersection of G Street and Hunting Park],

allowing traffic to, you know, stop for the police presence."  (Id. at 190-91.)  He then observed a

gray Dodge Charger "crossing through the Luke Oil [sic] parking lot, attempting to forego the six

or eight vehicles stopped at the red light . . . by cutting through and then going . . . westbound on

Hunting Park Avenue."  (Id. at 191.)  Officer Borrero further testified on direct examination: "Due

to the circumstances of the robbery and the response to the robbery, I just found it suspicious.  The

vehicle was slightly tinted.  I just found it suspicious that it was trying to avoid the stopped traffic,

---

[15]  As noted supra, no call data is recorded if a phone is not in use.

and it appeared to me that it may be trying to avoid the police presence as well." (Id.)  After observing this, Officer Borrero made a U-turn, activated his lights and sirens, and ultimately pulled over the Charger a block away from where it cut through traffic.  (Id. at 191-92.)

Officer Borrero and his partner exited their vehicle, approached the Charger, and began to talk to the driver, who was the sole occupant.  (Id. at 193.)  Officer Borrero noted the Charger's black front hubcaps and silver rear hubcaps, which the jury could see on the footage from Officer Borrero's body-worn camera.  (Id. at 196-97.)  He then asked the driver for his driver's license, registration, and insurance card.  (Id. at 193.)  The driver's license confirmed the driver was Tameer Miller and the vehicle was registered to Tyesha Miller.  (Id.)  Officer Borrero noticed that the license plate listed on the registration did not match the license plate affixed to the Charger.[16] (Id. at 194.)  Because of the robbery and the license plate discrepancy, Miller was asked to exit his vehicle, was temporarily detained, and was placed in the back of the officers' patrol vehicle.  (Id.) However, no identification of Miller was made then and the vehicle's registration was valid so the officers released Miller and continued patrolling the area to look for individuals matching flash descriptions provided over police radio.  (Id. at 200-01.)

Detective Donald Liebsch, a member of the FBI's Violent Crimes Task Force assigned to the FBI's Philadelphia field office, was investigating the Smith Pharmacy robbery.  (See Doc. No. 302 at 55-56.)  Detective Liebsch was informed by Officers Borrero and Morris that they had stopped a gray Dodge Charger, and during his investigation of the robbery, he watched the surveillance footage showing the gray Charger dropping off the two robbers near Smith Pharmacy. (Id. at 56-57.)  As a result, Detective Liebsch placed the vehicle on "felony status," which, as he

---

[16] The license plate on the Charger belonged to a vehicle in the "53/5400 block of Akron Street." (Doc. No. 302 at 59.)  As described infra, this address corresponds to one for Defendant John Suggs noted on a vehicle title certificate seized pursuant to a search of his residence.

explained during direct examination, means that "[t]he procedure there [for an officer stopping the vehicle] would be to identify everybody driving the vehicle and to have the vehicle towed so [the PPD Detectives Division] can process the vehicle." (Id. at 62-63.)

On March 11, 2018, PPD Officer Theodore Brown was on patrol in his marked police vehicle, observed the Charger with "dark-tinted windows," and "ran the tag in [the PPD's] computer system that's in the car, and it came back guard for prints." (Doc. No. 301 at 208.) The license plate matched the license plate affixed to the Charger when Officer Borrero stopped it ten minutes after the Smith Pharmacy robbery. (See Gov't Ex. 608.) Officer Brown explained that "guard for prints" "means that . . . the detective division wants the vehicle for investigation." (Doc. No. 301 at 208.) So Officer Brown activated his lights and pulled over the Charger. (Id. at 209.) Inside the Charger were Tameer Miller and two other occupants. (Id.) After running the three occupants' names in the PPD's computer system and seeing no active warrants for any of them, Officer Brown released them. (Id. at 209-10.) But the Charger was impounded "by police tow." (Id. at 210-11.)

### C.    Search of Defendant John Suggs's House

On April 19, 2018, law enforcement officers obtained a valid search warrant for Suggs's house and went there to execute it. (Doc. No. 302 at 66-67.) They knocked on the front door and Suggs answered. (Id. at 67.) Suggs was taken into custody and his house was searched. (Id.) The officers found the following items from Suggs's house:

- $19,067 cash found underneath the bottom shelf of a dresser (see Gov't Exs. 501, 504, 505);

- a multitude of yellow pills on top of the dresser and inside the dresser's top drawer (see Gov't Ex. 502);

- a driver's license for Suggs with the address 5418 Akron Street (see Gov't Ex. 501);

- a health insurance card (see id.);

- one LG phone and one iPhone,[17] which will be discussed in more detail infra (see Gov't Ex. 508);

- a 50-round box of Sig Sauer 9 millimeter (9mm) ammunition containing thirty-seven (37) rounds of 9mm Sig Sauer ammunition (see Gov't Exs. 506, 507);

- one (1) round of 9mm Sig Sauer ammunition (see Gov't Ex. 507);

- one (1) round of .357 magnum ammunition (see id.);

- a title for a reconstructed 2003 Chevrolet with the address 5418 Akron Street (see Gov't Ex. 510);

- a gray helmet for Steven Kempf Building Materials (see Gov't Ex. 513);

- a hockey mask (see Gov't Ex. 514);

- a gray sweatshirt with white drawstrings and white zipper (see Gov't Ex. 518); black striped Adidas pants (see Gov't Ex. 517).

The address on Akron Street on the driver's license and the certificate of title for the reconstructed 2003 Chevrolet matches the address on file for the license plate affixed to Tameer Miller's Charger shortly after the Smith Pharmacy robbery.  The Glock seen in surveillance video footage of the Smith Pharmacy Robbery is a handgun that uses 9mm ammunition.  The gray helmet for Steven Kempf Building Materials matches the helmet worn by Suggs on a post he made to Facebook while employed by Steven Kempf.  As noted earlier, during the Smith Pharmacy robbery, the robbers wore construction vests turned inside out with the embedded logo "Steven

---

[17] While officers were executing the search warrant on Suggs's home and had the iPhone in their custody, there was a notification on the screen showing that "Juice," who is Russell Williams, called Suggs's phone.  (See Gov't Ex. 508.)

Kempf." The gray sweatshirt matches the sweatshirt worn by Suggs during the Castor and Smith Pharmacy robberies and the black Adidas pants match those worn by Suggs during the Smith Pharmacy robbery.

> **D.   Information Obtained from Extraction Report
> of Defendant John Suggs's Cell Phone**

The two phones seized from Suggs's house were taken to the Regional Computer Forensic Laboratory in Radnor, Pennsylvania. (Doc. No. 301 at 222-23.) Michael Waski, a professional staff employee of the FBI, created an extraction report on Suggs's iPhone under a FBI special agent's supervision. (Id. at 223.) The extraction report represents a "user-friendly way" of navigating a phone's data.[18] (Id.) An extraction report is created by connecting a phone to a computer which then "will download the entire phone, all the messages that it can get to, search history, web history, contacts, sometimes voicemails, pictures for sure." (Id. at 222.) The extraction report also can uncover online searches even if a particular search term was deleted by the user from the phone's history. (Id. at 232.)

The extraction report confirmed that the iPhone belonged to Suggs because the phone number matched the number the parties stipulated at trial belonged to Suggs and the phone contained pictures of Suggs. (Id. at 228-29.) The extraction report of Suggs's iPhone revealed, among other items, the following search terms on the following dates:

- "masks that can avoid face recognition" on January 29, 2018 (Gov't Ex. 805);

---

[18] The extraction report need not contain all of a phone's data, but the report's creator can "pick items that [they] think are interesting or important to the investigation, and then [] can move them into a document, whether it's a PDF or a web page or even just a Word document or an Excel file so that [they] can present them either to the prosecutors or to a jury that are easier to see and understand." (Doc. No. 301 at 223.)

- "american pharmacy," "juanita [sic] pharmacy," "Oak Lane Pharmacy," "York St Pharmacy," "summerdale pharmacy," and "pharmacy of america" between November 15, 2017 and February 2, 2018 (Gov't Ex. 804 at 1-2); and

- "glock 43," "glock 43 accessories," "TALON Grips 100R Rear Wrap Rubber Grip for Glock 43, Black Rubber, Left/Right," and "Viridian Reactor 5 Green Laser Sight Pistol Handgun, ECR Instant on Holster" on January 24, 2018 (Gov't Ex. 806a).[19]

All of the above searches were deleted by Suggs from the phone's history.  (See Gov't Exs. 804, 805, 806a.)

Also found on Suggs's iPhone was contact information for "Crazy Lil," "Juice," "Nick," and "Shonda."  (Doc. No. 301 at 230-31.)  Those phone numbers correspond to the phone numbers belonging to Khalil Werts, Juice/Russell Williams, Defendant Nickolas Passineau, and Rashonda Henry, respectively.  (Id.)  The extraction report contains text messages from Suggs to a contact named "Tone" in which Suggs asks him for 9mm ammunition.  (Id. at 240; Gov't Ex. 806b at 3.)  Also contained in the extraction report are text messages from Suggs to "Chrizz valentino," wherein Suggs states:  . . . "I always got my bitch on me . . . ."  (Doc. No. 301 at 242-43; Gov't Ex. 806b at 3.)  SA Donahue, who was found qualified to provide his opinion as to what the text message meant, testified that "bitch" refers to a firearm.  (Doc. No. 301 at 243-47.)  The extraction report also contains text message conversations between Suggs and others in which he sends either (1) the quantities, weights, prices, and, in some instances, pictures of prescription drugs he is

---

[19]  On the same day Suggs searched for "glock 43" and "glock 43 accessories," Suggs also created a note in his phone that contains the following:  "Black nick juice me nick man reds."  (Gov't Ex. 812.)  SA Donahue testified that the note was significant "[b]ecause [B]lack, [N]ick, Juice, . . . were people that we suspected as being part of the robberies."  (Doc. No. 301 at 238.)

selling or (2) giving that information to someone else for that person to sell to a third party.  (See Gov't Ex. 809.)  The first such text message was sent by Suggs to "Dre" on October 19, 2017 at 1:15 p.m., which is less than four hours after the Castor Pharmacy robbery.  (See id. at 1.)

Drug Enforcement Administration ("DEA") Agent Eugene Giallombardo ("Agent Giallombardo"), who was found qualified "as an expert in narcotics and narcotics trafficking," testified that the quantities, weights, prices, and pictures were part and parcel of illicit drug sales. (Doc. No. 302 at 116, 124-36.)  Agent Giallombardo also examined the DEA forms prepared by Castor and Smith Pharmacies detailing the quantity and type of drugs stolen and stated that each of the drugs referenced in Suggs's text messages were drugs that were stolen from the pharmacies. (Id. at 124-36.)

### III.   STANDARD OF REVIEW

#### A.   Rule 29 Motion for Judgment of Acquittal

Under Federal Rule of Criminal Procedure 29, a defendant may file a motion for judgment based on insufficient evidence presented at trial.  See Fed. R. Crim. P. 29(c).  On a motion for judgment on acquittal under Rule 29, the court must decide whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" based on the evidence presented at trial.  United States v. Caraballo-Rodriguez, 726 F.3d 418, 431 (3d Cir. 2013) (en banc) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see also United States v. Tyler, 956 F.3d 116, 122 (3d Cir. 2020).  The court must view the evidence in a light most favorable to the prosecution and must deny the motion "if there is substantial evidence . . . to uphold the jury's decision."  Caraballo-Rodriguez, 726 F.3d at 430 (quoting United States v. Gambone, 314 F.3d 163, 170 (3d Cir. 2003)).  This standard is highly deferential and dictates that it is not the court's task to "act as the thirteenth juror," weigh credibility, assign weight to evidence, or "substitute [its]

judgment for that of the jury." Id. (citations omitted).  The decision to overturn a conviction based on insufficient evidence may only be made "where the prosecution's failure is clear," United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005) (quoting United States v. Smith, 294 F.3d 473, 476 (3d Cir. 2002) (citations omitted)), or where the verdict "fall[s] below the threshold of bare rationality," Tyler, 956 F.3d at 122-23 (quoting Caraballo-Rodriguez, 726 F.3d at 431).

### B.      Rule 33 Motion for a New Trial

Under Federal Rule of Criminal Procedure 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).  Granting or denying a motion for a new trial "lies within the discretion of the district court," United States v. Napolitan, 762 F.3d 297, 305 (3d Cir. 2014) (quoting United States v. Kelly, 539 F.3d 172, 181-82 (3d Cir. 2008)).  Unlike in a Rule 29 motion for judgment of acquittal, "when a district court evaluates a Rule 33 motion it does not view the evidence favorable to the Government, but instead exercises its own judgment in assessing the Government's case." United States v. Salahuddin, 765 F.3d 329, 346 (3d Cir. 2014) (quoting United States v. Johnson, 302 F.3d 139, 150 (3d Cir. 2002)).  A court may "order a new trial only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted . . . ." United States v. Silveus, 542 F.3d 993, 1004-05 (3d Cir. 2008) (citing Johnson, 302 F.3d at 150).  Indeed, Rule 33 motions are disfavored and should be "granted sparingly and only in exceptional cases." Salahuddin, 765 F.3d at 346 (quoting United States v. Brennan, 326 F.3d 176, 189 (3d Cir. 2003) (citation omitted)).  Exceptional cases include those in which trial errors "so infected the jury's deliberations that they had a substantial influence on the outcome of the trial." United States v. Greenspan, 923 F.3d 138, 154 (3d Cir. 2019) (quoting United States v. Thornton, 1 F.3d 149, 156 (3d Cir. 1993) (citation omitted)).

**IV.    ANALYSIS**

Both Defendants Suggs and Passineau move for judgments of acquittal.  Suggs seeks a judgment of acquittal on Count Four, which charges him with carrying and using a firearm during and in relation to the Smith Pharmacy robbery.  (Doc. No. 284 at 2-5.)  He alleges that the evidence supporting his conviction on Count Four was insufficient to sustain his conviction.  (Id.)  Passineau seeks a judgment of acquittal on Counts Three and Four, which charge him with the Smith Pharmacy robbery and carrying and using a firearm during and in relation to this robbery, respectively.  (Doc. No. 285 at 4-6, 11-14.)  He too alleges that the evidence tying him to the Smith Pharmacy robbery was insufficient to sustain his conviction.  (Id.)  Passineau also seeks a new trial on all counts because (1) "[a] significant amount of evidence was introduced during the trial against other Defendants which greatly prejudiced [him]"; and (2) the Court failed to grant him a separate trial for the Castor Pharmacy robbery from the Smith Pharmacy robbery.  (Id. at 7-10.)

For reasons discussed below, the evidence supporting Suggs's guilty verdict on Count Four and the evidence supporting Passineau's guilty verdict on Counts Three and Four were sufficient to sustain the convictions.  Furthermore, Passineau is not entitled to a new trial.

**A.    Suggs's Motion for Judgment of Acquittal on Count Four Will Be Denied Because Sufficient Evidence Supports His Conviction**

In his Motion for Judgment of Acquittal, Suggs argues that he should be acquitted on Count Four of the Superseding Indictment, which charges him with carrying and using a firearm during and in relation to the Smith Pharmacy robbery, in violation of 18 U.S.C. § 924(c).  (Doc. No. 284 at 2-5.)  He makes several arguments supporting his assertion that "[t]he testimonial evidence presented at trial that the gun was a firearm under the Federal definition was not sufficient, beyond a reasonable doubt, to support the conviction."  (Id. at 3.)  In particular, Suggs identifies in his Motion the following eight items he contends entitle him to acquittal on Count Four:

     (a) The Smith Pharmacy witnesses provided only scant information about the gun despite being in the best position to observe the gun and give a more detailed description;

     (b) The Smith Pharmacy witnesses did not testify that they had a working knowledge or familiarity with firearms;

     (c) No witness at Smith Pharmacy testified that they ever felt the gun which could support the argument that the gun was the [sic] of the same weight or made of the same materials as an actual firearm;

     (d) No witness at Smith Pharmacy ever testified at trial that the defendant performed actions on the gun consistent with a real firearm (i.e. pulled the hammer back; racked the slide; inserted a magazine; fired a bullet, etc.);

     (e) The only evidence from someone with a background in firearms who was actually physically present at the scene of the crime (ATM repairman McShane) was that it appeared to be a Glock firearm; however, he only had scant seconds to observe the weapon and that was done while looking through the glass entry door;

     (f) Agent Donahue also testified as to the possibility that the gun appeared to be a Glock firearm; however, his observation[s] are based on looking at still photos and video as he did not personally observe the firearm;

     (g) No firearm was ever recovered;

     (h) Evidence of an internet search for Airsoft which produces replica BB guns which would not qualify under the Federal definition of a firearm.

(Id. at 3-4.)

Suggs's Motion for Judgment of Acquittal on Count Four will be denied, however, because when viewing the evidence in the light most favorable to the prosecution as the verdict winner, sufficient evidence supports his conviction. Specifically, as noted above, the testimony of four eyewitnesses—Yarelis Torres, Dayana Colon, Melonise Lynch, and Steven McShane—and of SA Donahue provides sufficient evidence for a jury to find that Suggs was using a firearm during and in relation to the Smith Pharmacy robbery.

The essential elements of carrying and using a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c), are (1) that the defendant committed a crime of violence, (2) that during and in relation to the commission of the crime, the defendant knowingly used a firearm, and (3) that the defendant used the firearm during and in relation to the crime of violence.  See Third Circuit Model Criminal Jury Instruction 6.18.924B (2022).  Therefore, for Suggs's Motion to succeed he must establish that no rational trier of fact could have found that the essential elements for a conviction under § 924(c) were met here.  Regarding the first element, Suggs does not dispute that he participated in the robbery of Smith Pharmacy and that this robbery was a crime of violence.  Thus, the issue as to elements (2) and (3) is whether a firearm was knowingly possessed by him and used in the robbery.

Here, the evidence is sufficient to establish that Suggs knowingly possessed and used a firearm during the Smith Pharmacy robbery.  All Smith Pharmacy robbery eyewitnesses who testified at trial described one of the robbers as wielding a gun.  (See Doc. Nos. 301 at 121, 143-44, 164-65; 302 at 11.)  Eyewitness Melonise Lynch, a pharmacy employee, testified that Suggs pointed a firearm at her face.  (Doc. No. 301 at 165.)  Surveillance footage from inside Smith Pharmacy corroborates her testimony and that of the other eyewitnesses about the presence of a firearm.  (Gov't Ex. 312.)

In addition, Steven McShane, the ATM repairman who saw an armed Suggs through the front door of the store, testified that he believed that the firearm was a Glock.  He based his testimony on his many years of possessing a license to carry firearms and his ownership of several handguns, "including "a couple of Glocks, a couple Springfields, [and] a few Rugers . . . ."  (Doc. No. 302 at 13.)  Specifically, McShane described Glocks as "blocky in nature.  They have a

rectangular stock that's more squared off than most guns.  A lot of guns are rounded."  (Id. at 16-17.)

McShane's testimony was further corroborated by the testimony of SA Donahue, who owned Glocks for about six or seven years, has been issued Glocks as his service weapon as a police officer, and whose father, also a police officer, owned Glocks.  (Doc. No. 302 at 51.)  In addition, SA Donahue testified that he owns a particular model of Glock identified as a Glock 43 and that it looks similar to the firearm wielded by Suggs during the Smith Pharmacy robbery.  (Id.)  Again, SA Donahue testified:  "In particular, looking at the rear sight, that appears to be the standard Glock rear sight which comes as a -- as a white kind of bar with little tabs on the end for aiming."  (Id.)  SA Donahue also distinguished for the jury the difference between a Glock and a 9 millimeter Taurus 92, a picture of which was offered into evidence by defense counsel:

> So one of the things in particular to Glocks that I know, specific Glocks, and compared with this Taurus is the rear [sight] is different.
> . . .
> If you particularly on the front [of the Glock], but . . . it almost comes to a 90-degree angle[].  Whereas, [the barrel on the Taurus handgun] is rounded off.  The barrel seems more exposed.  Whereas, in the Glock, the barrel is completely encased in the slide on top.

(Id. at 52.)  Moreover, SA Donahue noted that Suggs referred in his text messages to always having a gun with him.  (Doc. No. 301 at 243-47.)

The facts in this case are fairly similar to those in United States v. Beverly, in which the defendant was charged with a firearm offense in violation of 18 U.S.C. § 924(c).  99 F.3d 570, 570-71 (3d Cir. 1996).  Defendant Beverly and an accomplice approached James McCullough, an on-duty postal worker, and Beverly lifted up his shirt, revealing to McCullough a gun secured in his waistband.  Id. at 571.  The accomplice took from McCollough's pants pockets twenty dollars and Beverly ordered McCollough to accompany them to a parked car.  Id.  Beverly threatened

McCollough several times during the walk to the car.  Id.  The threats consisted of statements like "I should pop you right here.  I should cap you right now."  Id.  McCullough testified at trial the Beverly "took [the gun] out so [McCullough] could see it in the split of the front seat" and "described the gun as a chrome-plated revolver."  Id.

Thus, the "only evidence presented" at Beverly's trial "with respect to the firearms charge was the testimony of [a non-expert witness] that [the defendant] threatened him with a gun during the course of the robbery, and that the gun, which was displayed in the car, was a chrome-plated revolver."  Id. at 572.  "[T]he gun was not recovered and there was no evidence that the gun was fired."  Id.  The Third Circuit affirmed on appeal the district court's denial of Beverly's Rule 29 motion, stating as follows:

> We find no error in this ruling.  McCullough saw the gun on two occasions, decreasing the likelihood that he was mistaken as to the authenticity of the weapon.  Additionally, McCullough's close proximity to Beverly while he brandished the weapon further diminishes the possibility that the object he was threatened with was anything other than a firearm.  The defendant's own expert psychologist testified that, in the presence of a gun, the tendency of the victim is to concentrate attention on the gun instead of on the face of the assailant.  . . .  Considering this testimony, McCullough had ample time to view the weapon while he was in the defendant's car.  Finally, Beverly threatened McCullough's life numerous times during the course of the robbery.  McCullough's testimony was sufficient evidence for a jury to conclude that the defendant utilized a firearm in the commission of his crime.  "'The act of threatening others with a gun is tantamount to saying that the gun is loaded and that the gun wielder will shoot unless his commands are obeyed.'"  Parker [v. United States], 801 F.2d [1382,] 1384 [(D.C. Cir. 1986)] (quoting [United States v. ] Marshall, 427 F.2d [434,] 437 [(2d Cir. 1970)]).

Id. at 573; see also United States v. Bonner, 469 F. App'x 119, 132 (3d Cir. 2012) ("[A]n eyewitness's description of having seen a firearm is sufficient [to sustain a conviction under § 924(c)]." (citing Beverly, 99 F.3d at 572).

Here, there was more evidence produced at Suggs and Passineau's trial than "the testimony of [a non-expert witness] that [the defendant] threatened him with a gun during the course of the

robbery . . . ." Beverly, 99 F.3d at 572.  Specifically, the testimony of four eyewitnesses, including one familiar with firearms, all led the jury to convict Suggs and Passineau on Count Four by finding that they used a firearm during the Smith Pharmacy robbery.  Surveillance footage confirms the firearm's existence.  And unlike the defendant in Beverly, Suggs here did not keep his gun in his waistband, but instead held it in his hand for all inside Smith Pharmacy to see.

Furthermore, Suggs pointed the gun directly at Melonise Lynch's head, an act "tantamount to saying that the gun is loaded and that the gun wielder will shoot unless his commands are obeyed." Id. at 573 (quoting Parker, 801 F.2d at 1384) (quoting Marshall, 427 F.2d at 437). Moreover, ammunition was found in Suggs's apartment, Suggs texted an associate to find nine-millimeter ("9mm") ammunition that is suitable for a 9mm handgun,[20] and Suggs also texted a friend about always carrying a firearm with him.

In addition, as defense counsel acknowledges, "the prosecution need not present direct evidence that the weapon was loaded or operable; rather, it is sufficient that the prosecution present evidence from which the jury could reasonably infer that the firearm could be fired, or was designed to be fired."  (Doc. No. 284 at 2 (citing United States v. Hunter, 101 F.3d 82, 85 (9th Cir. 1996)).)  A jury could reasonably infer from the mere fact alone that Suggs held a gun to Melonise Lynch's face that it could be fired or was designed to be fired.  See Beverly, 99 F.3d at 573 (citing Parker, 801 F.2d at 1384).   Melonise Lynch was mere inches away from Suggs's firearm.[21]

---

[20]  Although Suggs referred in his text message to a "nine Tauras [sic]" (Gov't Ex. 806b at 1), 9 millimeter ("9mm") ammunition is suitable for any firearm that fires 9mm ammunition, including a Glock handgun.

[21]  Despite Suggs's contentions that no witness to the Smith Pharmacy robbery saw Suggs "pull[] the hammer back; rack[] the slide; insert[] a magazine, or fire[] a bullet" (Doc. No. 284 at 4), these actions are not necessary where a defendant, like Suggs, points a firearm inches away from another's face during a robbery.  See Beverly, 99 F.3d at 573 (citing Parker, 801 F.2d at 1384).

Moreover, a firearm need not be recovered to sustain a conviction under § 924(c).  See id. at 572. For all these reasons, there is sufficient evidence to support Suggs's guilty verdict on Count Four of the Superseding Indictment.  His Motion for Judgment of Acquittal (Doc. No. 284) therefore will be denied.

### B.  Passineau's Motion for Judgment of Acquittal on Counts Three and Four Will Be Denied Because Sufficient Evidence Supports His Convictions

Passineau moves for judgment of acquittal on Counts Three and Four, charging him with the Smith Pharmacy robbery, using of a firearm during and in relation to the robbery, and aiding and abetting the commission of the same offenses, respectively.  Regarding Count Three, he asserts that "the evidence failed to establish beyond a reasonable doubt that either one of the robbers was Defendant Passineau."  (Doc. No. 285 at 4.)  In support of this assertion, he emphasizes that (1) the Smith Pharmacy robbery witnesses were not asked to make in-court identifications of Passineau, (2) they did not identify him in photo arrays conducted shortly after the robbery, (3) Passineau did not contact Miller via cell phone, and (4) DNA samples taken from a glass counter inside Smith Pharmacy did not belong to him.  (Id. at 5-6.)  Regarding Count Four, Defendant asserts that because the evidence tying him to the Smith Pharmacy robbery is insufficient, then "he could not have utilized a weapon in connection with the robbery."  (Id. at 6.) However, his Motion for Judgment of Acquittal on Counts Three and Four will be denied because when viewing the evidence in the light most favorable to the prosecution as the verdict winner, sufficient evidence supports his convictions.

### 1.  The Sufficiency of the Evidence on Count Three

Suggs and Passineau were in constant contact with each other the morning of the robbery up to a few minutes before the robbery.  Cell site data showed Suggs drive to Passineau's house to pick him up and then drive to Tameer Miller's mother's house.  From there, Miller drove them in

his Dodge Charger which had the unique black front hubcaps and silver rear hubcaps to a spot a block away from Smith Pharmacy. The two men were seen on surveillance footage being dropped off. They were wearing construction vests.

Surveillance footage taken from inside Smith Pharmacy and played for the jury showed Passineau approach the pharmacy from the outside. He was wearing a black hoodie and a construction vest. He could be seen on video footage walking past cars parked directly outside Smith Pharmacy's front door. He was not wearing a face mask. He turned around and put on a mask almost immediately before entering the pharmacy with Suggs. After entering, he could be seen on video footage in the pharmacy area stuffing a bag with prescription medications. Whether this man was Passineau was for the jury to determine and by their verdict the jury found it was him.

Dayana Colon, one of the pharmacists working at Smith Pharmacy during the robbery, was shown a lineup of six photographs. When shown the sixth photograph which depicted Passineau, Colon stated "he looks most like the guy." (Gov't Ex. 309 at 3.) And after a prompt asking whether Colon is confident that the individual depicted in Photograph #6 is the person that committed the robbery, she stated that "[h]e is the closest." (Id.)

In addition, Khalil Werts, one of the lookouts for the Castor Pharmacy robbery and who testified about Passineau's involvement in that robbery, testified that he called Suggs after he saw a video posted on Facebook requesting information about surveillance footage showing the Smith Pharmacy robbery. During the phone call, Werts referenced Passineau's face being caught on camera and testified that Suggs told him that Passineau was stupid for not putting on his mask. Given all the facts, as presented to the jury, there was sufficient evidence to convict Passineau on

Count Three for committing the Smith Pharmacy robbery.  His Motion for Judgment of Acquittal on Count Three therefore will be denied.

### 2.     The Sufficiency of the Evidence on Count Four

Passineau also argues that he is entitled to a judgment of acquittal on the Count Four gun charge because there was "no evidence linking [him] to the robbery of the Smith Pharmacy."  (Doc. No. 285 at 6.)  For this reason, he continues, "he could not have utilized a weapon in connection with the robbery."  (Id.)  As discussed supra, there is sufficient evidence supporting his conviction for the Smith Pharmacy robbery and also sufficient evidence supporting Suggs's conviction under § 924(c) for using and carrying a firearm during the same robbery.  Because there is sufficient evidence showing Passineau was the other robber with Suggs inside Smith Pharmacy, even though Passineau never displayed a firearm, the jury properly convicted him of committing and aiding and abetting the Hobbs Act robbery.  Aiding and abetting a completed Hobbs Act robbery is a predicate crime of violence under the first element of § 924(c).  United States v. Stevens, 70 F.4th 653, 662 (3d Cir. 2023) (holding that aiding and abetting completed Hobbs Act robbery is a § 924(c) predicate crime of violence).

In addition, there is sufficient evidence that Passineau had the requisite knowledge to be convicted as an aider and abettor under § 924(c) even though he never displayed a firearm.  "Under 18 U.S.C. § 2, the federal aiding-and-abetting statute, a defendant who is not directly liable under § 924(c) may nonetheless be held liable if he '(1) takes an affirmative act in furtherance of [the underlying crime of violence], (2) with the intent of facilitating the offense's commission.'"  United States v. Quinn, 2023 WL 4106249, at *1 (3d Cir. June 21, 2023) (quoting Rosemond v. United States, 572 U.S. 65, 71 (2014)).  "[I]f a defendant continues to participate in a crime after a gun was displayed or used by a confederate, the jury can permissibly infer from his failure to

object or withdraw that he had . . . knowledge [that his confederate will commit the underlying crime of violence]."  Rosemond, 572 U.S. at 78 n.9.

Here, the jury found that Passineau aided and abetted Suggs's use of a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c).  Sufficient evidence supports his conviction.  First, Suggs was armed as he entered the pharmacy alongside Passineau.  Second, the eyewitnesses testified that both robbers announced that they were robbing the pharmacy.  Third, surveillance footage shows Passineau a few feet away from Suggs while he is holding his firearm at Melonise Lynch's face.  Passineau's failure to walk away from the robbery at any time and his continued participation in it is sufficient evidence for a jury to infer that Passineau knew that Suggs had and was using a firearm to facilitate the robbery.

Consequently, Passineau's Motion for Judgment of Acquittal on Count Four will be denied.

### C.  Passineau's Motion for a New Trial on Counts One, Three, and Four Will Be Denied

Defendant Passineau also moves for a new trial on Counts One, Three, and Four of the Superseding Indictment for two reasons.  (Doc. No. 285 at 7.)  First, he alleges that the introduction of the significant amount of evidence against Suggs, such as the clothing and ammunition found in Suggs's house during a search, the text messages between Suggs and others indicating the Suggs possessed a firearm, and text messages sent by Suggs appearing to negotiate drug deals, spilled over to him in the jury's mind and "greatly prejudiced Defendant Passineau." (Id. at 7-8.)  Second, Passineau argues that "extreme prejudice was suffered by [him] resulting from the two Pharmacy robberies being tried together," and that the spillover of evidence from each robbery prevented the jury from considering his guilt separately on each robbery charge.  (Id. at 9-10.)  But, for reasons stated infra, Passineau's request for a new trial will be denied because he has not demonstrated "a serious danger that a miscarriage of justice has occurred."  See Silveus, 542 F.3d at 1004-05 (citing

Johnson, 302 F.3d at 150).  In fact, there was no danger that a miscarriage of justice occurred.  It

is evident that the jury followed the Court's instructions to consider Passineau's guilt on each

charge separately.

Federal Rule of Civil Procedure 8 describes joinder of offenses and joinder of defendants.

Rule 8(b) provides:

> (b) Joinder of Defendants.  The indictment or information may charge 2 or more
> defendants if they are alleged to have participated in the same act or transaction, or
> in the same series of acts or transactions, constituting an offense or offenses.  The
> defendants may be charged in one or more counts together or separately.  All
> defendants need not be charged in each count.

Fed. R. Crim. P. 8(b).  "Joint trials of defendants named in a single indictment are favored because

they 'conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid

delays in bringing those accused of crime to trial.'"  United States v. Jimenez, 513 F.3d 62, 82 (3d

Cir. 2008) (quoting United States v. Lane, 474 U.S. 438, 449 (1986)).

In United States v. Lacerda, the Third Circuit explained the proper standard for joinder of

multiple offenses committed by multiple defendants:

> "[I]n a multi-defendant case such as this, the test for joinder of counts and
> defendants is merged in Rule 8(b)."  United States v. Irizarry, 341 F.3d 273, 287
> (3d Cir. 2003) (internal quotations omitted).  "Although the standards of Rule 8(a)
> and Rule 8(b) are similar, in that they both require a transactional nexus between
> the offenses or defendants to be joined, Rule 8(a) is more permissive than Rule 8(b)
> because Rule 8(a) allows joinder on an additional ground, i.e., when the offenses
> are of the same or similar character."  Id. at 287 n.4 (citations and internal
> quotations omitted); see also Jimenez, 513 F.3d at 82 ("[J]oinder of defendants
> under Rule 8(b) is a stricter standard than joinder of counts against a single
> defendant under Rule 8(a).").  For joinder . . . to have been proper under Rule 8(b),
> [the charges] either would have to originate "in the same act or transaction," or have
> otherwise been integral to one another.  See United States v. Riley, 621 F.3d 312,
> 334 (3d Cir. 2010).

958 F.3d 196, 224 (3d Cir. 2020).  A "transactional nexus" between offenses joined under Rule 8(b) exists where the defendants "participated in 'the same act or transaction, or in the same series of acts or transactions' . . . ."  Jimenez, 513 F.3d at 82-83.

Relatedly, Federal Rule of Criminal Procedure 14 governs the severance of offenses joined under Rule 8(b).  As the Third Circuit explained in Riley:

> The Federal Rules of Criminal Procedure permits a court to sever counts that have been properly joined under Rule 8(b) "[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant . . ."  Fed. R. Crim. P. 14. Severance should only be granted "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  United States v. Urban, 404 F.3d 754, 775 (3d Cir. 2005) (quoting Zafiro v. United States, 506 U.S. 534, 539 (1993)).  A defendant must "pinpoint clear and substantial prejudice resulting in an unfair trial."  United States v. McGlory, 968 F.2d 309, 340 (3d Cir. 1992) (internal quotation marks and citation omitted).  Thus, "[i]t is not enough to show that severance would have increased the defendant's chances of acquittal."  Id.

621 F.3d at 335.  Furthermore, where the district court "specifically instructed the jury that it 'must separately consider the evidence against each defendant on each offense charged, and . . . must return a separate verdict for each defendant on each offense,'" the Third Circuit has held that "[t]hese strict instructions are 'persuasive evidence that refusals to sever did not prejudice the defendants.'"  Id. (quoting United States v. Lore, 430 F.3d 190, 206 (3d Cir. 2005)) (internal quotation marks and citation omitted); see also Zafiro, 506 U.S. at 540-41 ("[J]uries are presumed to follow their instructions.") (citing Marsh, 481 U.S. at 211).

With this background of joinder of offenses and defendants, the Court now will address Passineau's claims that (1) the introduction of evidence against Suggs spilled over to him and prevented the jury from separately considering his guilt and (2) the Court improperly denied his pretrial motion to sever the Castor Pharmacy robbery from the Smith Pharmacy robbery.

1.    **Joinder of Suggs and Passineau Did Not Create a Danger**
      **of a Miscarriage of Justice**

"Ordinarily, defendants jointly indicted should be tried together to conserve judicial resources." United States v. Allinson, 27 F.4th 913, 925 (3d Cir. 2022) (internal quotation marks omitted) (quoting United States v. Eufrasio, 935 F.2d 553, 568 (3d Cir. 1991)). "The 'inquiry into whether . . . defendants were properly joined focuses upon the indictment, not upon the proof that was subsequently produced at trial.'" Walker, 657 F.3d at 168 (quoting Irizarry, 341 F.3d at 287). Put differently, "[n]either a disparity in evidence, nor introducing evidence more damaging to one defendant than others entitles seemingly less culpable defendants to severance." Allinson, 27 F.4th at 926 (internal quotation marks omitted) (quoting Eufrasio, 935 F.2d at 568).

Instead, a defendant must "show real prejudice arising from the joint trial either compromising his trial rights or preventing the jury 'from making a reliable judgment about guilt or innocence.'" Id. (quoting United States v. Lore, 430 F.3d 190, 205 (3d Cir. 2005) (citation omitted)). In Zafiro v. United States, the United States Supreme Court explained when such prejudice against a co-defendant exists:

> Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant. For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty. When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened. See Kotteakos v. United States, 328 U.S. 750, 774-75 (1946). Evidence that is probative of a defendant's guilt but technically admissible against a codefendant also might present a risk of prejudice. See Bruton v. United States, 391 U.S. 123 (1968). Conversely, a defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial. See, e.g., Tifford v. Wainwright, 588 F.2d 954 (CA5 1979) (per curiam). The risk of prejudice will vary with the facts in each case, and district courts may find prejudice in situations not discussed here. When the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but, as we indicated in Richardson v. Marsh, less drastic measures,

> such as limiting instructions, often will suffice to cure any risk of prejudice.  See
> 481 U.S. [200,] 211 [(1987)].

506 U.S. 534, 539 (1993).  And as noted above, a district court's instructions to the jury that it

compartmentalize the evidence against each defendant and on each count are "persuasive evidence

that refusals to sever did not prejudice the defendants." Riley, 621 F.3d at 335 (internal quotation

marks omitted) (Lore, 430 F.3d at 206).

Here, there was no prejudice arising from Passineau being tried jointly with Suggs that

would prevent the jury from making a reliable judgment about his guilt, and Passineau's request

for a new trial on this ground will be denied.

First, Passineau was properly joined with Suggs at trial.  The Superseding Indictment

charged Suggs and Passineau with participating in the same offenses in Counts One, Three, and

Four.  Neither are charged with separate offenses.  And as noted by the Court in denying

Passineau's pretrial severance motion, severance is not required where there is a "disparity in

evidence" or where "evidence more damaging to one defendant than others" is introduced.  See

Allinson, 27 F.4th at 926 (citing Eufrasio, 935 F.2d at 568).

Second, the jury was instructed to compartmentalize the evidence offered against Suggs

and Passineau and to separately consider the evidence relating to each offense as it relates to each

Defendant.  See Zafiro, 506 U.S. at 539-41 ("[L]ess drastic measures [than severance], such as

limiting instructions, often will suffice to cure any risk of prejudice. . . .  [J]uries are presumed to

follow their instructions.") (internal quotation marks omitted) (quoting Richardson v. Marsh, 481

U.S. 200, 211 (1987)); see also Riley, 621 F.3d at 335.  Here, Passineau highlights that evidence

introduced against Suggs was held against him by the jury even though he was not connected to

the evidence.  For example, text messages from Suggs to other persons not indicted in this case

coordinated the sale of drugs stolen from the pharmacies and implied that Suggs always carries a

firearm with him.  The ammunition found in Suggs's apartment was seized pursuant to a lawful search, and the clothing found in Suggs's apartment was similar to clothing from pictures posted on Suggs's Facebook profile page.  But a jury could easily parse out this evidence and other evidence in deciding who was responsible for the robberies.  Given all the evidence introduced against Passineau personally, there was sufficient evidence introduced to support his involvement in the offenses.   Thus, it is evident that the jury followed the Court's instructions to compartmentalize the evidence against each Defendant and on each Count in considering their guilt or innocence.

Third, this case was not complex and eyewitness testimony, expert testimony, surveillance footage, and communications between co-defendants clearly demarcated each co-defendant's role in the respective robberies.  The prosecution's theory of the case was that Suggs was the ringleader of the robberies and Passineau was more of a subordinate.  The jury saw that Passineau partook in both robberies by stealing drugs from behind the pharmacies' counters, placing them inside bags, and running away from the pharmacies with the drugs.  It was easy for the jury to compartmentalize the evidence against Passineau and Suggs and to find them guilty based upon their own conduct in the robberies.

### 2.    Joinder of the Two Robberies Did Not Create a Danger of a Miscarriage of Justice

Passineau's  second  argument  that  the  Court  wrongfully  joined  for  trial  the  Castor Pharmacy and Smith Pharmacy robberies also is without merit.[22]  Here, the similarities in the two

---

[22] In his Motion for Judgment of Acquittal and/or New Trial, Passineau notes that he filed a pretrial Motion to Sever the Smith Pharmacy and the Castor Pharmacy Robberies for Trial (Doc. No. 106).  (Doc. No. 285 at 9.)  In the June 16, 2022 Opinion explaining the reasons for denying the severance motion, the Court stated:  "Although Defendants argue that there are few similarities between the two robberies, they are part of the 'same series of acts or transaction.'  . . .  [T]he

robberies and the evidence produced at trial demonstrates that Suggs and Passineau participated in "the same series of acts or transactions." Jimenez, 513 F.3d at 82-83. They participated in both robberies which were committed in a similar fashion. And as noted supra, the Court gave the jury the following instructions:

> [I]n our system of justice, guilt or innocence is personal and individual. You must separately consider the evidence against each Defendant on each offense charged and you must return a separate verdict for each Defendant on each offense.
> . . .
> Your decision on any one Defendant or any one offense, whether guilty or not guilty, should not influence your decision on any other Defendant or offense. Each offense and each Defendant should be considered separately.

(Doc. No. 303 at 176-77.) Moreover, Passineau's conclusory assertions that he suffered "extreme prejudice" by having the two robberies tried together do not suffice to establish the requisite prejudice. He does not "pinpoint clear and substantial prejudice resulting in an unfair trial."

The Court finds as persuasive authority here the Third Circuit's decision in United States v. Staton, 605 F. App'x 110 (3d Cir. 2015). In Staton, two defendants, Barrett Staton and Matthew Staton, were indicted on ten counts involving wire and mail fraud and conspiracy to commit those offenses. See id. at 112. Another defendant, William Haken, Jr., also was indicted, but he pled guilty and testified against his two co-defendants. See id. at 112-13. Matthew Staton filed a pretrial motion for severance of his trial from Barrett Staton, which was denied by the district court. See id. at 112. After a ten-day jury trial, they were convicted on all counts. See id. at 112-13. Both Statons appealed their convictions. Matthew Staton raised on appeal as error the district court's denial of his motion for a separate trial from Barrett Staton. See id. at 114.

---

two robberies are extraordinarily similar, which is evidence of a common scheme or plan." (Doc. No. 226 at 6.)

The Third Circuit affirmed the Statons' convictions and stated the following regarding Matthew's motion to sever the trial:

> Matthew has also failed to "pinpoint clear and substantial prejudice" from the joinder of his trial with Barrett's.  See United States v. Riley, 621 F.3d 312, 335 (3d Cir. 2010) (internal quotation marks and citations omitted).  His contention that his "involvement in the business and the crimes was far less," Matthew Staton Br. 10, than that of Barrett, is insufficient to establish prejudice because "a defendant is not entitled to a severance merely because evidence against a co-defendant is more damaging than the evidence against the moving party." Lore, 430 F.3d at 205 (internal quotation marks and citations omitted).  Moreover, there is no evidence to support Matthew's assertion that the jury was unable to compartmentalize the evidence presented against Barrett with respect to the mail fraud and false statement charges.  Riley, 621 F.3d at 335.  The evidence in the case was "relatively straightforward and discrete" and not "overly technical or scientific." Lore, 430 F.3d at 205; United States v. Walker, 657 F.3d 160, 170-71 (3d Cir. 2011).  Furthermore, the District Court instructed the jury to "separately consider the evidence against each defendant on each of the offenses charged" and told the jury that its "decision on any one defendant or any one offense . . . should not influence [its] decision on any of the other defendants or offenses." Barrett Supp. App. 264.  Jurors are presumed to follow their instructions, Richardson v. Marsh, 481 U.S. 200, 211 (1987), and we have no reason to doubt that they did so here.  We therefore find that the District Court did not abuse its discretion in denying Matthews's motion to sever.

Id. at 115.

Here, the jury at Suggs and Passineau's joint trial, like the jury in Staton, was instructed to separately consider the evidence against each defendant on each of the offenses charged.  Passineau does not assert that the jury was unable to compartmentalize the evidence against him relating to each robbery.  Furthermore, this case was "relatively straightforward," not "overly technical or scientific." See id.  Thus, Passineau's argument that he was prejudiced by the introduction of more evidence against Suggs than against him is unpersuasive.  A miscarriage of justice did not occur.  Accordingly, Passineau's Post-Trial Motions for Judgment of Acquittal and/or a New Trial (Doc. No. 285) will be denied.

48

**V.      CONCLUSION**

For the foregoing reasons, Defendant Suggs's Motion for a Judgment of Acquittal Pursuant to Federal Rule of Criminal Procedure 29 (Doc. No. 284) and Defendant Passineau's Motions for Judgment of Acquittal and a New Trial pursuant to Federal Rules of Criminal Procedure 29 and 33 (Doc. No. 285) will be denied.  An appropriate Order follows.